**UNITED STATES of America,**

v.

**Abdel ELTAYIB, Jorge Pena, Jaime Monsalvo–Padilla, William Morales, Honorato Parco, Juan Navarette, Carlos Neira, Segundo Azahuanche, Jesus Amaya, Defendants.**

**No. CR 91 792 (S).**

United States District Court,
E.D. New York.

Dec. 3, 1992.

Andrew J. Maloney, U.S. Atty. (Jonathan Sack, Asst. U.S. Atty., of counsel), Brooklyn, NY, for the United States.

Eric M. Schlosser, New York City, for defendant Eltayib.

Sam Schmidtt (Lawrence Boracas, of counsel), New York City, for defendant Pena.

Charles Lavine, Forest Hills, NY, for defendant Monsalvo–Padilla.

Bernard H. Udell, Brooklyn, NY, for defendant Morales.

Barry Rhodes, Brooklyn, NY, for defendant Parco.

Michael Cohen, Plantation, FL, for defendant Navarette.

Marc Zuckerman, Brooklyn, NY, for defendant Neira.

Joseph A. Gentile, Williston Park, NY, for defendant Azahuanche.

Joel S. Walter, Brooklyn, NY, for defendant Amaya.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

The nine remaining defendants in this case have made motions which were the subject of hearings on November 16, 17, and 18, 1992. The indictment charges two conspiracies, one to import into the United States more than five kilograms of cocaine, and the other to distribute and possess with intent to distribute that cocaine.

In a memorandum and order dated April 16, 1992, (familiarity with which is assumed), this court held that if the government proved the facts it proffered, the court would have subject matter jurisdiction and the venue would lie in this district. The facts established at the hearing fully satisfy both subject matter jurisdiction and venue.

The court now has before it motions raising four issues, namely, whether (1) items of evidence taken from the vessel on which defendants were captain and crew were seized in violation of one or more defendants' Fourth Amendment rights, (2) statements by the captain, defendant Eltayib, to government agents were taken in violation of his rights under the Fifth Amendment and 18 U.S.C. § 3501, (3) identifications of three defendants were made from improperly suggestive photograph arrays, and (4) the defendants other than Eltayib are entitled to a severance in the event his statements are admitted in evidence.

### I. Motion to Suppress Evidence Seized from the Vessel

■ The court finds from the evidence that the following facts were known to government agents prior to the search of the vessel.

On July 19, 1991 a confidential informant, a crew member on the fishing vessel Hunter, informed the Coast Guard that the Hunter was going out to meet a freighter and pick up a load of cocaine in the vicinity of Hudson Canyon offshore in the Atlantic Ocean. At 2:05 A.M. on Saturday, July 20, 1991, the Hunter departed the Jamaica Bay area, passed by the Coast Guard Air Station in Brooklyn, and then exited the Rockaway Inlet heading offshore in a southerly direction towards the vicinity of Hudson Canyon.

At 4:05 P.M. on the same day, the Hunter was 15 nautical miles north of the suspected off-load site in Hudson Canyon, about 100 miles south of Long Island and 80 miles off the coast of New Jersey. The following day, Sunday, July 21, 1991, at 2:20 P.M., the Hunter was about six nautical miles south of Fire Island on Long Island heading in a westerly direction towards its moorings in Brooklyn.

Later that afternoon the Coast Guard stopped the Hunter, boarded it, and searched it. The boarding party found 210 bales of kilo brick sizes of cocaine. The confidential informant, who had been aboard the Hunter, told the Coast Guard officers that it had received the cocaine from a 200 foot, blue hulled, white superstructured Panamanian registered freighter, with a red bottom and having four containers on deck. He also identified the cargo's booms as being yellow and described numerous persons on the deck.

He said the off-load to the Hunter from the freighter had occurred around midnight on July 20, 1991 and at the place the government had suspected. He also said that the Hunter collided with the freighter, causing a scratch or dent in the freighter's hull.

The nautical chart on the Hunter showed a blue mark at the suspected off-load site. In addition, another Hunter crew member

told one of the agents that of the freighter's two-word name the second word was Crown.

On Tuesday, July 23, at about 5:00 P.M., the Coast Guard agents learned that a vessel bearing the name the Blue Crown and matching the previous description of the freighter had been located at Reedy Anchorage in Delaware Bay, about 42 nautical miles inland from the entrance to the Atlantic Ocean and about 10 nautical miles south from Wilmington, Delaware. The agents then decided to establish surveillance on the vessel through the night and to board it on the morning of Wednesday, July 24, 1991.

On that day agents boarded the Blue Crown at about 8:28 A.M. They conducted a security sweep which was concluded at about 9:35 A.M. The vessel was then taken to the dock in Salem, New Jersey, arriving about 1:18 P.M.

A special agent of the Coast Guard, Patrick Maher, then went from New York to Salem, arriving about 4:00 P.M., and confirmed that the Blue Crown matched the description given by the confidential informant. He determined from the log and other documents on the Blue Crown that it had proceeded northward in the vicinity of the off-load site and on the night of July 20, 1991 had come within a few miles of a place indicated by a blue dot on a chart on the Hunter, marking the approximate site of the off-load.

■ The agents thus had more than reasonable suspicion, indeed had probable cause to believe, that the crew members on the Blue Crown had been engaged in an attempt to import cocaine into the United States. The agents therefore had ample authority to conduct a thorough border search of the vessel and of the personnel on board. The port at Salem, New Jersey, was the functional equivalent of the border. *See United States v. Alfonso,* 759 F.2d 728, 733–37 (9th Cir.1985) and cases cited. The court finds that the search of

the Blue Crown, which commenced on July 24, 1991 and continued on July 25 and 26, 1991, was proper.

■ Defendants urge that even if the search of the hold and other general areas of the vessel was valid, the search of the living quarters of the crew members was improper. The *Alfonso* case dealt with this very contention, and held that a border search could extend to the crew's living quarters and even encompass sealed packages secreted beneath a bunk bed. The court sustained such a search on reasonable suspicion that contraband was on board. *See* 759 F.2d at 737–38. It did not require such suspicion as to the particular crew members whose packages were seized.

Similarly, the Court of Appeals for the Second Circuit has upheld a border search as valid even where it extended to a seaman's locker. *United States v. Massiah,* 307 F.2d 62, 67 (2d Cir.1962).

The motion to suppress the items of evidence seized from the Blue Crown is denied.

## II.  Statements by Eltayib

■ Eltayib, the captain of the Blue Crown, asserts that statements he made to agents at about 10:30 P.M. and 11:45 P.M. on July 24, 1991 were illegally obtained.

Eltayib was twice given his *Miranda* warnings, once at about 5:00 P.M. and the second time at about 9:30 P.M. on July 24, 1991. On the first occasion, at Eltayib's own request, the agent read the warnings to him in English, and Eltayib responded in English. On the second occasion the agent administered the rights in Spanish, and Eltayib answered in English.

Eltayib says there was too great a delay after the 5 o'clock reading of the warnings to make that reading effective with respect to the evening statements made at 10:30 P.M. and 11:45 at night. As to the 9:30 P.M. warnings he asserts that there is no proof that he understood Spanish.

Neither contention has merit. Eltayib impressed the court, both in his personal oral statement to the court and in his role

as captain of the Blue Crown, as being intelligent and worldly. He was hardly a man to be intimidated or to be forgetful of his own interests. He undoubtedly spoke Spanish, the only language spoken by the eight crewman over whom he evidently exercised tight control both before and after his arrest. Moreover, he answered the Spanish questions in English with apparent understanding of their meaning.

The court finds that the warnings were properly administered, that Eltayib understood both the offense he was suspected of and the warnings and his rights of which he had been advised, and that he made his statements knowingly, voluntarily, and without coercion or improper influence. While he was not free to depart, he was not put under formal arrest until about 10:00 P.M. before his final statement at 11:45 P.M. But the circumstances of his detention from the time of the boarding of the Blue Crown were not such as to coerce his statements or to make them involuntarily.

A more difficult question is presented by Eltayib's contention that his statements are made inadmissible by language in 18 U.S.C. § 3501.

That section is hardly a model of clarity. It has five subsections. Subsection (d) provides that nothing in Section 3501 is to bar the admission in evidence of any "confession" [defined in subsection (b) to include any self-incriminating statement] where the confessor is not under arrest or other detention.

■ The first sentence of subsection (a) states unambiguously that in any federal prosecution "a confession shall be admissible in evidence if it is voluntarily given." The subsection then provides that before the statement is received in evidence the trial judge, out of the presence of the jury, is to determine any issue as to voluntariness, and if the judge admits the statement as voluntary, he or she is to allow evidence before the jury on the issue and to instruct the jurors to give such weight to the state-ment as they feel it deserves. All that seems clear.

So is the import of subsection (b). It provides that the judge in determining the issue of voluntariness is to consider "all the circumstances" including (1) "the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment," (2) whether the defendant knew of the prospective charge against him, (3) and (4) whether he was warned and advised of his rights, and (5) whether he had the assistance of counsel when questioned.

Subsection (b) then adds that the "presence or absence of any" of the above five factors "need not be conclusive on the issue of voluntariness."

The language of the first two subsections of Section 3501 thus makes it clear that the judge is to admit the statement after determining it is voluntary and in making that determination to give such weight to each of the five factors as he or she deems appropriate. In other words, the judge is free to give much or little weight, for example, to the lapse of time between "arrest and arraignment".

Subsection (c) introduces ambiguity, particularly because its critical proposition takes the form of a double negative. That subsection states that a confession by a person while under arrest or detention "shall not be inadmissible solely because of delay" in bringing the person before a magistrate for arraignment if the trial judge finds the confession to have been made "voluntarily," if the weight of the confession is left to the jury, and "if" the confession was made "by such person within six hours immediately following his arrest or other detention."

Then in a final proviso subsection (c) states: "Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate ... beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to

be traveled to the nearest available magistrate...."

Subsection (c) does not purport to say that a confession "shall" be "inadmissible" when there has been a delay of more than six hours between detention and arraignment. To say that a confession "shall not be inadmissible solely" because of a more than six hour delay is not to say that the confession "shall be inadmissible" because the delay is in excess of six hours.

The reasonable import of the subsection is that the judge is authorized to find the confession inadmissible "solely" because of a delay if it is of more than six hours. But nothing in the subsection mandates that the judge exclude the confession "solely" because of a more than six hour delay. In short, to give the trial judge authority to exclude in reliance "solely" on a delay of more than six hours is not to require him to do so.

This is the effect of the decision of the Court of Appeals for the Second Circuit in *United States v. Perez*, 733 F.2d 1026 (2d Cir.1984). In that case the trial court suppressed the defendant's statement on the ground of "unnecessary and unreasonable" delay beyond six hours from the time of arrest. The Court of Appeals held that under 18 U.S.C. § 3501 "a delay of greater than six hours *may* by itself be grounds for suppression unless the delay is found to be reasonable" (emphasis in original). *Id.* at 1030.

The court specifically did not hold that delay beyond six hours mandated the trial court to exclude the confession, stating "[p]erhaps it is true that delay alone does not *require* suppression." (Emphasis in original). *Id.*

■ This court declines to suppress the statements made by Eltayib more than six hours before his arraignment. As described above, other factors that the court is required to take into consideration under subsection (b) indicate that Eltayib's statements were voluntary. He knew the nature of the offense of which he was suspected. He was twice advised of his *Miranda* rights. For reasons already stated the court holds that the statements were voluntarily given.

Even if the court were disposed to consider the lapse of time in isolation from the other factors, the court finds that the delay was reasonable under the circumstances. It is true that the crew of the Blue Crown was being detained in the early morning of July 24, 1991. But during most of that day the agents were preoccupied with confirming whether the vessel was in fact the one that had off-loaded cocaine to the Hunter in the ocean and with moving the Blue Crown to a dock in Salem, New Jersey.

The agents did not deliberately delay arraignment in order to get statements from Eltayib. In fact they received no authorization from the United States Attorney's office to effectuate an arrest until about 10:00 P.M. on July 24, 1991.

Even if the language of subsection (c) without the final proviso quoted above were to be interpreted to require that the court exclude the statement because of the delay in arraignment, the court would find that factor of the delay was far outweighed by other factors and that the delay was reasonable within the meaning of that proviso.

The statements of Eltayib will be admitted, and the court will instruct the jury in accordance with the requirements of 18 U.S.C. § 3501(a).

### III. The Photograph Arrays

The court has examined the photograph arrays from which the confidential informant identified three of the defendants.

The court finds that the arrays were not improperly suggestive.

### IV. Severance Motions

One of the statements made by Eltayib to the agents was that the crew members had been recruited in Columbia and transported to Venezuela to join the vessel.

The crew members ask for a severance in the event this statement is admitted in evi-

dence. The argument is that, although the statement does not itself identify the other defendants, the jury will inevitably use this evidence against them.

■ The law is clear that such a statement need not be excluded where it does not on its face expressly incriminate another defendant but becomes incriminating only when linked to other evidence offered at trial. *Richardson v. Marsh,* 481 U.S. 200, 208, 211, 107 S.Ct. 1702, 1707, 1709, 95 L.Ed.2d 176, 186, 188 (1987); *United States v. Tutino,* 883 F.2d 1125, 1134–35 (2d Cir. 1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). This presupposes an appropriate instruction to the jury that it may consider the statement only against Eltayib.

The court reserves for trial the question of whether the statement should be excluded under Rule 403 of the Federal Rules of Evidence.

### V. Conclusion

The motions of the defendants are denied. So ordered.