UNITED STATES of America, Appellee,

v.

Abdel ELTAYIB, Jaime Enrique Monsalvo Padilla and Jorge Portocarrero Pena, Defendants–Appellants.

Nos. 563, 564, 565, 566, 567 and 568, Dockets (94–1542(L)), 94–1543, 94–1546, 94–1547, 94–1674, 94–1676 and 95–1046.

United States Court of Appeals, Second Circuit.

Argued Jan. 22, 1996.

Decided July 8, 1996.

---

Jonathan S. Sack, Assistant United States Attorney, Eastern District of New York, Brooklyn, New York (Zachary W. Carter, United States Attorney, and Peter S. Norling, Assistant United States Attorney, Brooklyn, NY, on the brief), for Appellee United States of America.

David Gordon, Gordon & Horwitz, New York City, for Defendant–Appellant Eltayib.

(David H. Weiss and Georgia J. Hinde, New York City, filed a brief for Defendant–Appellant Pena.)

(Lynne F. Stewart, New York City, filed a brief for Defendant–Appellant Padilla.)

Before: WINTER, JACOBS and PARKER, Circuit Judges.

JACOBS, Circuit Judge:

Through a tip, the government learned that a ship-to-ship transfer of a large cocaine shipment was going to take place 80 miles off the coast of New Jersey. The Coast Guard deployed high-tech aerial surveillance, but the technology failed and the two ships got away. The boat that received the cocaine (over 4700 kilograms of it) had the government's informant aboard, so that boat was easily found and detained later the same day. Two days later, by a stroke of luck, the government found what it believed to be the transferring ship. The ship's nine crew members were arrested, tried before a jury, and convicted of three crimes: possession of cocaine with the intent to distribute, conspiracy to do the same, and conspiracy to import cocaine into this country. Three of the defendants—the captain (Eltayib), the first mate (Pena), and the chief engineer (Padilla)—appeal their convictions and sentences.[1]

Most of their contentions on appeal may be summarily rejected. One gives us pause. Eltayib claims that the photo array presented to the government's informant for the purpose of identifying Eltayib was filled with photographs of people who looked nothing like Eltayib. In addition, Eltayib claims that the photographs in the array were altered to highlight the one feature that was central to the informant's on-site description of the suspect: his hair. We agree with Eltayib that the photo array was improperly suggestive, that there is no independent basis of reliability for the identification, and that its admission therefore violated his rights under the Due Process Clause. However, as we explain at length below, the other evidence against Eltayib is sufficiently overwhelming to support his conviction. In the end, then, despite our dismay about the improper photo array, we conclude that this error was harmless and therefore affirm the convictions and sentences of all three defendants.

## I. FACTS

The Blue Crown, a 203–foot blue and white freighter, sat in port at Puerto Cabello, Venezuela on July 1, 1991. Over the next two days, the ship took on 17 large containers filled (according to its manifest) with toilet paper and napkins. When it left Venezuela on July 3, the Blue Crown set out on its ostensible course northwest through the Caribbean to deliver the paper products to Guatemala. The next day, however, it was rerouted northeast to Barbados—where it was supposedly to take aboard more containers—and then north on the Atlantic to New York for "annual docking." According to Coast Guard officials, this circuitous course along the perimeter of the Caribbean would avoid the Coast Guard anti-narcotics surveillance deployed there.

After six days at sea, the Blue Crown docked in Barbados. Local customs officials

---

1. Of the other six crew members, five filed notices of appeal and then asked—some by motion, some by stipulation—that their appeals be dismissed.

conducted a limited search of the ship for drugs, and found none. While there, the Blue Crown received new instructions, sending it to Newark (instead of New York) for "dry docking," purportedly to fix a mechanical problem, despite the fact that dry docking facilities were available nearby in the Caribbean.

As the Blue Crown proceeded north in the Atlantic, drug trafficker Peter Califano was in Brooklyn plotting cocaine importation strategy. As he did, Califano told his friend and commercial-fishing partner Thomas Van Salisbury that a large cocaine shipment arriving from South America by boat would be delivered to Califano in a mid-ocean transfer. Van Salisbury agreed to accompany Califano and to help with the transfer. As the transfer day approached, a nervous Van Salisbury contacted the FBI and told them that a July 20 late-evening rendezvous had been planned. The expected meeting place was somewhere in the Jones Valley, a deep-water spot popular with New York-area fishermen, located about 80 miles east of Atlantic City and about 100 miles south of Montauk on Long Island's eastern tip.

In the early hours of July 19–20, Califano's fishing boat, the Hunter, set sail from its berth near Coney Island. After a bit of afternoon fishing, Califano directed Van Salisbury to head toward a spot in Jones Valley marked on the Hunter's nautical chart, having the coordinates 39° 30′ North, 72° 00′ West. As they sailed to the spot, one of the ship's metal outriggers, broken earlier in the day and strapped to the radar mast as a quick fix, hung out the port side with its swinging tip extending over the side. At about 9:00 p.m., with Van Salisbury in the engine room, the Hunter approached the rendezvous point and came in sight of the delivering courier ship.

Meanwhile, federal law enforcement officials were in the air and sea looking for the two ships. Twice between 9:00 p.m. and 3:00 the next morning, a C–130 cargo plane, equipped with enhanced radar, radioed to three Coast Guard patrol boats the coordinates where (according to the plane's radar) there was a suspected "off-load situation" occurring. The first location was 20 miles southwest of the spot given to federal agents by Van Salisbury, and the second was 25 miles southeast of the first location. At each spot, the patrol boats found empty ocean. During this time, the surveillance plane reported problems with its radar. The radar screen faded in and out and seemed to provide conflicting information. In a test radar reading of one of the Coast Guard boats, the radar was off by five miles. Although the C–130 could not pinpoint the vessels that blipped on its radar screen, it consistently reported seeing two (and at one point three) ships operating right next to one another between about 9:30 p.m. and 3:00 a.m., by which time its radar showed the two ships separating.

In fact, the Hunter and the courier ship did link up around 9:30 p.m. Having spotted the courier boat, Van Salisbury, on directions from Califano, attempted to align the Hunter with the speed and path of the other boat. With the two boats proceeding on parallel courses, two men on the courier boat (one carrying a rifle) shouted angrily at Califano and Van Salisbury that they had originally mistaken the Hunter for a Coast Guard ship. Van Salisbury claims that he saw the faces of the two men at this point. At a subsequent debriefing, he picked Pena (Blue Crown first mate) and Carlos Neira (a Blue Crown crew member, not an appellant here) from two photo arrays, identifying them as the two shouters. At trial, Van Salisbury was able to identify Neira in court, but not Pena.

After the shouting, Van Salisbury tried to bring the Hunter alongside the courier ship, but was "getting real nervous." Approaching the other ship too quickly, the Hunter's port side (with the metal outrigger hanging over the side) slammed into the courier ship's starboard side near the stern. The next approach was better executed, and the boats were tied off. Van Salisbury then left the wheelhouse and came on deck with Califano. For the next several hours, nearly five metric tons of cocaine were tossed off the courier ship in bales onto the deck of the Hunter. At several points during the cocaine transfer, Van Salisbury stood on the deck of the Hunter and saw crew members on the courier ship, one of whom he later identified in a

photo array as Eltayib (captain of the Blue Crown). Because our ruling on the admissibility of Van Salisbury's identification of Eltayib depends in large part on a precise understanding of Van Salisbury's opportunity to see Eltayib, we review in detail what transpired after the two ships were lashed together.

When Van Salisbury left the wheelhouse and went on deck, the sea had a "slight roll"; the night was "fairly bright, [but][t]here was no [moon] beams coming down." Standing on the Hunter's deck, Van Salisbury heard what he believed to be large metal plates scraping together on the courier ship, as if its hold was being opened. Just as he was asking Califano how the other boat's crew was going to transfer the cocaine to the Hunter, a bale of cocaine came flying onto the Hunter's deck, nearly bouncing off the deck into the ocean. Califano shouted to the courier ship crew expressing displeasure with the near-mishap. He and Van Salisbury then opened up the Hunter's fish hold where they were to store the cocaine, and Van Salisbury climbed down into it. Van Salisbury's testimony on direct examination suggests that very little time elapsed between the first bale's arrival and his descent into the fish hold. He did not indicate during his direct testimony that he saw anybody on the courier ship's deck during this interval.

As Van Salisbury entered the fish hold, a flying bale of cocaine hit him and broke the ladder he was standing on, dropping him eight to ten feet to the fish hold floor. Possibly dazed, he clambered back onto the deck. He testified that at this point he saw two men on the rail of the courier ship, 35–40 feet away, one of whom he "had a good look at":

Q: Could you describe what you were able to make out?

A: That man there, he had, seemed like a head full of hair, real bushy hair, afro-type hair, seemed like an awful lot of hair for the head. I don't know how to really describe it but he had a lot of hair.

This was the only time during Van Salisbury's direct examination that he mentioned seeing the bushy-haired man, and it was the only description that he gave. Just after this

question, the government asked Van Salisbury to stand up, look around the courtroom, and try to identify the bushy-haired man. He could not.

On cross-examination, Van Salisbury's account of the amount of time he spent on the Hunter's deck between the arrival of the first bale and his descent into the fish hold seemed to change. He testified that after the first bale hit the deck but before entering the fish hold, he was "on the deck and in the wheelhouse" for ten to fifteen minutes. Later he testified that he had spent a full fifteen minutes "on the deck" before entering the fish hold. During this time, he said, the "bushy-haired" man was at the courier ship's rail the entire time. When pressed about the amount of time that he had spent looking at the bushy-haired man during the fifteen minutes he was on the deck, Van Salisbury's testimony indicates that (i) he saw very little of the bushy-haired man's face, and (ii) he may have been confused about whether this fifteen-minute interval during which he saw the man occurred before or after he had descended into the fish hold:

A: I didn't look directly at his face but for a few moments. I seen him up there. I didn't stare into his face. *When I got out of the fish hold,* I looked up and I seen the person.

Q: So when you say you saw the person, all you saw is that the person had bushy hair, is that right?

A: I remembered his face and bushy hair, yes.

Q: You remembered his face and what—what is it that you remembered about his face?

A: I can't recall right offhand.

Q: Would it be fair to say that anything you remembered that when you were debriefed by Agent Maher on the Coast Guard cutter, you told him at that time, isn't that right?

A: At that time that I remembered I told him, yes.

(Emphasis added.) According to the record, the only information Van Salisbury provided to Agent Maher about the suspect's physical characteristics was that he had bushy hair.

Later in his cross-examination, Van Salisbury testified that when he came out of the fish hold after getting hit with the bale, he looked at the bushy-haired man's face for only "[a] few moments . . . a few seconds or better."

Once Van Salisbury returned to the fish hold, he apparently stayed there for the remainder of the delivery, stacking the cocaine bales that passed continuously from courier ship deck to Hunter deck, and from Hunter deck into the fish hold. By about 2:00 a.m. on July 21, the transfer was complete, and the two boats separated.

Later that day, the Coast Guard captured the Hunter as it sailed along Fire Island toward Brooklyn. At a debriefing with Coast Guard agents, Van Salisbury described the courier ship as 200 feet long with a white superstructure, orange-colored booms, and a hull painted blue above the water line and copper-colored below the water line. Significantly, Van Salisbury had not seen the name of the courier vessel at any time before, during or after the off-load. Coast Guard and Customs officials began a massive search along the North Atlantic seaboard for the courier ship.

On July 23, two days after the drug transfer, the Blue Crown was anchored off of Salem, New Jersey, a coastal town up the Delaware River near Wilmington. Though the ship's latest post-Barbados itinerary had it heading to dry dock (apparently in Newark), the evidence indicates that there were no dry docking facilities in the Philadelphia–Delaware–Southern New Jersey area. The Coast Guard conducted a routine inspection of the Blue Crown, finding cartons of paper in its hold that were not marked in customary fashion. On alert, Customs officials attempted without success to locate the importer listed in the Blue Crown's documentation. Now suspicious, Customs and Coast Guard officials realized that the Blue Crown (203 feet-long, white superstructure, blue hull above the water line, red hull below it, and yellow booms on its side) closely matched the description of the suspect vessel. Coast Guard agents boarded the Blue Crown, arrested the nine crew members, and towed the ship to port in Salem.

A search of the ship turned up clues linking the Blue Crown to the drug transaction with the Hunter. First, a trained narcotics dog "alerted" to the smell of drugs in several places on the ship's deck and in the hold. Second, although the ship's log book contained meticulous readings of the Blue Crown's location coordinates, as inscribed by Eltayib and Pena, there was a 48–hour lacuna in the entries with an annotation indicating that the readings coming in from the ship's satellite navigation equipment during that time were inaccurate. This 48–hour period included the hours of the July 20–21 drug transfer. Third, the agents found undeveloped rolls of film in one of the Blue Crown's cabins; when developed, the film included six photos of the navigation equipment's screen showing the coordinates of the ship at six different times during the 48–hour logbook gap. The fifth and sixth photos, taken at 8:30 p.m. on July 20 and 12:30 a.m. on July 21, show coordinates (39° 23′ North, 71° 58′ West; 39° 45′ North, 71° 58′ West) very close to the arranged rendezvous point between the Hunter and the courier ship (39° 30′ North, 72° 00′ West). Fourth, the agents found a piece of paper in the Blue Crown's chartroom, in Eltayib's handwriting, indicating a time (9:40 p.m.) and coordinates (39° 29′ North, 71° 57′ West) that are consistent with the rendezvous time and location. Fifth, the ship had heavy steel plates covering its hold, consistent with Van Salisbury's testimony that he heard metal plates scraping just before the cocaine bales began flying. Finally, the Blue Crown had a fresh dent and scratches on its starboard aft hull, which is where the courier ship would have been struck by the hull and broken outrigger of the Hunter when Van Salisbury accidentally slammed the Hunter into the courier ship. Paint chips taken from the area around the dent in the Blue Crown matched paint chips taken from the Hunter's deck.

Ten days after the high-seas transfer, Drug Enforcement Agency Agent Bradley Cheek showed Van Salisbury nine photo arrays. Each array contained a photo of a different crew member and seven filler photos. Van Salisbury identified three of the crew members: Pena and Neira (whom he

had seen during the shouting exchange before the boats were tied together) and Eltayib (apparently the "bushy-haired" man). Pena does not challenge his photo array, but Eltayib challenges his. We describe the Eltayib array in section II below.

Eltayib, Pena, Padilla and the rest of the Blue Crown crew were indicted for possession of cocaine with the intent to distribute (21 U.S.C. § 841(a)(1)), conspiracy to possess cocaine with intent to distribute (21 U.S.C. § 846), and conspiracy to import cocaine (21 U.S.C. §§ 952(a), 960(a)(1), 963). Several times during the year-and-a-half leading up to trial, Eltayib (joined occasionally by the other defendants) requested new counsel, claiming that his lawyer was not spending enough time on the case and was not pursuing the best possible defense. Shortly before trial, the district court denied his requests. In a published opinion, the court also denied (i) Eltayib's motion to suppress the statements he made to federal agents shortly after his arrest on the ground that the Miranda warnings were improperly given, and (ii) Eltayib, Pena and Neira's motion to suppress Van Salisbury's photo-array identifications on the ground that the arrays were improperly suggestive. *United States v. Eltayib*, 808 F.Supp. 160, 163–65 (E.D.N.Y. 1992).

On December 7, 1992, a jury was selected, and the eight-day trial began. On December 23, following a day-and-a-half of deliberations, the jury returned guilty verdicts on all three counts against all nine defendants. Shortly after the verdict, the defendants renewed their motions for replacement counsel. This time, the court granted the motions, and each defendant chose a new lawyer. They then moved to set aside the verdict and for a new trial, primarily because their trial counsel had been ineffective, in violation of their Sixth Amendment rights. The defendants faulted their trial counsel for failing to exploit evidence of the Coast Guard's aerial surveillance suggesting that an "off-load situation" had taken place at a different location. Had this evidence been used, said the defendants, a reasonable doubt would have been

created about whether the Blue Crown was in fact the courier ship. The district court denied the motion, emphasizing the weight of circumstantial evidence that linked the Blue Crown to the scene of the drug transfer. It concluded that aggressive use of the surveillance information would not have undermined the government's case. No. 92–CR–792, slip op. at 6 (E.D.N.Y. Sept. 21, 1994).

At his sentencing hearing, Eltayib argued that he was a minimal participant in the various crimes and therefore deserved a four-level reduction in his Sentencing Guidelines offense level. The district court refused to grant the reduction, and sentenced Eltayib to over 24 years in prison. Padilla and Pena each received over 12 years. All three defendants also received supervised release terms of five years, and a $150 special assessment.

In addition to Eltayib's challenge to the photo array, discussed in section II below, the three defendants raise seven other arguments on appeal: (1) Eltayib claims that his Sixth Amendment rights were violated when the district court denied his pre-trial requests for new counsel; (2) Eltayib claims that the district court erred in denying his motion to suppress his post-arrest statements; (3) Eltayib claims that he received ineffective assistance of counsel because a) his trial counsel failed to exploit evidence from the Coast Guard's aerial surveillance of the drug transfer, and b) his trial counsel did not object to the requirement that Eltayib wear prison garb in court; (4) all three defendants claim that the district court erred in giving a "conscious avoidance" instruction to the jury; (5) Eltayib claims that several comments by the government during its closing argument constituted prosecutorial misconduct, and that the government also committed prosecutorial misconduct before the grand jury; (6) Padilla claims that the evidence was insufficient to convict him beyond a reasonable doubt; and (7) Eltayib claims that he was improperly denied a reduction in his offense level under the Sentencing Guidelines.[2] We reject all of these claims, as we explain in section III.

---

2. We have examined the arguments in the brief filed by former appellant Segundo Lucio Cruz

Azahuanche, who withdrew his appeal by a motion granted after the current appellants had

## II. THE ELTAYIB PHOTO ARRAY

At his debriefing and at trial, Van Salisbury described the man at the railing of the courier ship as having "a head full of hair, real bushy hair, afro-type hair." Even when pressed, he could not describe any features of the man's face.

One would think that if a suspect is described only in terms of one characteristic, the filler photos in an array would also portray people having that characteristic. Otherwise, there may be no real identification, just a witness with the wit to suppose that the one suspect with the salient characteristic must be the person suspected by the authorities. *See Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

■ The Eltayib photo array was presented to Van Salisbury by DEA Agent Bradley Cheek. We have examined it. The array's eight photos are cut roughly along the head and shoulders. The scissors line on Eltayib's photo travels slightly above his shoulders, a bit outside his neck, and then around *and above* his head, so that the full outline of the top and sides of his full head of hair can be clearly made out. As to each of the seven other photos, the line of the scissors defines the head with straight strokes that crop the head (and such of the hair as remains) into an irregular polygon. Because the tops and sides of the photos have been cropped in this way, it is impossible to tell what style or amount of hair these men may have had. However, the cropping gives all seven the appearance of short hair cut close to the head (albeit at strange angles). None has "a head full of hair, real bushy hair, [or] afro-type hair." Eltayib thus stands out as the only one of the eight who could remotely fit Van Salisbury's description of the man he saw at the rail of the courier ship.

In another apparent precaution, Eltayib is made to stand out by his skin color. He is a Sudanese man of apparent Arab descent with a light complexion. The other seven are all men of apparent sub-Saharan African de-

scent with skin tones that range from medium brown to dark brown.

The government defends the array on appeal in the following terms:

The seven photographs in addition to that of Eltayib—all cropped to depict the head and neck of the men—were of Black men who had varying lengths of what Van Salisbury described as "afro-type" hair. The seven other men had various skin color.... [I]n each photograph the person depicted had "afro-type" hair.... [T]he men displayed a range of complexion not dramatically different from Eltayib's.

This is misleading in several respects. "Afro" is a fashion term describing a full, rounded hairdo that stands out from the head. Van Salisbury used the term that way, as is obvious from his other descriptions of the man's hair. After the cropping of the photos, however, none of the seven other men in the photo array appears to have big hair. The government seems to suggest that because the men are of African descent, their hair can be described as "afro-type" regardless of size. This ignores both the ordinary meaning of the word "afro" and Van Salisbury's description of the suspect not as having a certain "type" of hair, but as having a lot of it. It is also misleading for the government to say that the photo array shows men with hair of "varying lengths." No one can tell from the array what length their hair may actually have been.

■ A photo array is improperly suggestive if "the picture of an accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit." *United States v. Thai,* 29 F.3d 785, 808 (2d Cir.) (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994). *See also Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Simmons,* 390 U.S. at 384, 88 S.Ct. at 971. For the reasons stated above, we believe that the picture of Eltayib

filed their briefs. To the extent that Azahuanche's arguments apply to Eltayib, Padilla and Pena, we reject them as without merit.

so stood out from the other photographs as to make the array improperly suggestive.

■ Even if an array is improperly suggestive, the witness's identification of the suspect from among the array's filler photos is still admissible if the identification has independent reliability. *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. The question is

> whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive.... [T]he factors to be considered in evaluating the likelihood of misidentification include [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382–83. Van Salisbury's opportunity to make a genuine identification of the bushy-haired man (factor 1) was small. Van Salisbury stood on the deck of a bobbing ship in the middle of the night, nervous, and possibly dazed from falling off a ladder after being hit by flying cargo; he was in position to see the man in question on another moving ship at a distance of 35 to 40 feet for fifteen (or perhaps only a few) minutes, but he did not look directly at the man's face for more than a few moments. What little he could say about the man can hardly be called an "accurate description" of a suspect (factor 3), and suggests that he really did not get "a good look" at the bushy-haired man. Van Salisbury may have had an incentive to pay close "attention" (factor 2) to the physical characteristics of the Blue Crown crew members (since he was a government informant), but he admitted that he did not take the opportunity to scrutinize the bushy-haired man's face for very long. There is no indication that Van Salisbury expressed uncertainty during his photo array identification (factor 4), but that would seem to cut the other way given the suggestive nature of the array. The fact that the identification took place ten days after Van Salisbury first saw Eltayib (factor 5)

does not seem probative one way or the other.

Thus, other than (possibly) factor 4, the indicia of reliability are few and weak. When these circumstances are combined with Van Salisbury's failure to identify Eltayib at trial, there is no dependable evidence to support the conclusion that Van Salisbury ever knew what Eltayib's face looked like. We therefore conclude that Van Salisbury's photo array identification was not independently reliable, and that it violated Eltayib's due process rights to admit the identification.

■ We must not reverse Eltayib's conviction unless this constitutional error was "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See also Moore v. Illinois,* 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977) (pretrial identification violated defendant's Sixth Amendment right to counsel, but case remanded for harmless error determination); *United States v. Concepcion,* 983 F.2d 369, 379 (2d Cir.1992) (admission of improperly suggestive identification at pretrial hearing was harmless error), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *United States v. Archibald,* 734 F.2d 938, 943(2d Cir.1984) (improperly suggestive in-court identification was harmless error). The evidence linking Eltayib and the Blue Crown to this crime was overwhelming. Van Salisbury's description of the courier boat matched the description of the Blue Crown; Van Salisbury's account of the collision between the two boats corresponded to the dents and scratches on the aft starboard hull of the Blue Crown; paint chips found on the Blue Crown matched paint samples taken from the Hunter; photographs taken by the Blue Crown crew and a slip of paper in Eltayib's handwriting found in the chartroom confirmed that the ship was in the same spot as the Hunter when the drug transfer took place; a trained drug-detection dog reacted positively to several spots on the Blue Crown's deck and in its hold; and Van Salisbury successfully identified the Blue Crown's first mate (from a photo array) and a Blue Crown crew member (from a photo array and again at trial). In short, there is little room

for doubt that the Blue Crown was the courier ship. And it is undisputed that Eltayib was captain of the Blue Crown. Despite the error in admitting the photo array identification of Eltayib, we are sure that the jury's verdict was unattributable to the error, and that the error was thus harmless. *See Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ("The inquiry [under *Chapman* ] ... is ... whether the guilty verdict actually rendered in this trial was surely unattributable to the error."). We therefore reject Eltayib's argument that his conviction must be reversed on this basis.

### III. OTHER ARGUMENTS

*A. Requests for Appointment of New Counsel*

Eltayib argues that the district court erred in denying his pre-trial requests for new court-appointed counsel, notwithstanding his pre-trial submissions claiming that his lawyer was incompetent, uninterested, and "a detriment to my cause"; that the district court failed to undertake the required inquiry to determine whether counsel should be replaced; that the court acted unfairly in forcing him to choose between keeping his lawyer or defending himself *pro se;* and that all this violated his Sixth Amendment rights.

Before the trial began, Eltayib submitted three written requests for new counsel. Upon receiving the first submission, the district court held a hearing on the validity of Eltayib's assertions. Contrary to Eltayib's claim that counsel lacked interest in representing him, defense counsel stated (as Eltayib later confirmed) that he had visited his client three times over a one-and-a-half month period and had devoted considerable time and resources to the case. Additional facts suggested that Eltayib's claims were disingenuous. At the hearing, Eltayib implied that his court-appointed counsel had improperly demanded money from him. When later pressed, Eltayib withdrew that imputation. Moreover, it became apparent in the course of the hearing that Eltayib had caused at least one other defendant to sign a letter almost identical to the one he submitted to the court requesting new counsel, and

that his codefendant neither understood the letter's contents nor wanted a new lawyer. Under the circumstances, the district court was entitled to conclude that Eltayib's claim was spurious and that his lawyer was defending him zealously and competently. The court's denial of Eltayib's request was therefore proper. *See Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624, 109 S.Ct. 2646, 2651, 105 L.Ed.2d 528 (1989) ("The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."); *United States v. Perez,* 904 F.2d 142, 151 n. 3 (2d Cir.) (defendant's pretrial request for new counsel based on claimed communication problems properly denied by district court when court had reason to believe that problems were not legitimate), *cert. denied,* 498 U.S. 905, 111 S.Ct. 270, 112 L.Ed.2d 226 (1990).

■ Because many of the concerns expressed by Eltayib in his second and third letters to the court simply repeated his earlier complaints about his attorney, and because the first hearing demonstrated that Eltayib's complaints about counsel were disingenuous, the district court was under no obligation to make further inquiry. *See United States v. Calabro,* 467 F.2d 973, 986 (2d Cir.1972) (formal inquiry is unnecessary where the court has "reason to suspect the *bona fides* of the defendant"), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1386, 35 L.Ed.2d 587 (1973).

■ Because the denial of Eltayib's request for new counsel was proper, it was also proper to explain to Eltayib that he was thus left with only two options: keeping this lawyer or proceeding *pro se. See McKee v. Harris,* 649 F.2d 927, 931–32 (2d Cir.1981) (trial court's proposed alternative to defendant to proceed *pro se* or to continue with appointed counsel was proper where the record as a whole indicated that defendant's reason for changing attorneys was insubstantial), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982). After the court

carefully explained to Eltayib the hazards of defending himself, Eltayib told the court that he preferred to keep his lawyer. We therefore conclude that the court's rulings on this issue did not violate Eltayib's Sixth Amendment rights.

### B. Post-Arrest Statements

■ Eltayib argues that the district court erred in admitting into evidence the passports of the Blue Crown crew and his post-arrest statements to law enforcement officials. A district court's decision to admit evidence is reviewed for abuse of discretion. *United States v. Beverly*, 5 F.3d 633, 638 (2d Cir.1993). The government introduced the passports to establish that the nine defendants entered Venezuela together shortly before the Blue Crown left Puerto Cabello on its trip north. The passport evidence is probative of the fact that the defendants were on board the Blue Crown when it left Puerto Cabello. Eltayib claims that this evidence was prejudicial because the passports also indicated that the defendants had entered Venezuela from Colombia, and because jurors will associate travel to Colombia with the drug traffic. We certainly disagree that this is a necessary inference. Because the passport evidence had important probative value, we do not believe that the district court abused its discretion in determining that the danger of unfair prejudice (if any) from the admission of passports with Colombian departure stamps did not substantially outweigh the probative value of the passports. *See* Fed.R.Evid. 403.

■ Eltayib also argues that his post-arrest statements should have been suppressed because he was not given *Miranda* warnings immediately prior to the statements, and because the effect of two *Miranda* warnings read to him earlier the same evening had dissipated by the time he made his statements. In rejecting this argument, the district court found

> that Eltayib understood both the offense he was suspected of and the warnings and his rights of which he had been advised, and that he made his statements knowingly, voluntarily, and without coercion or improper influence.

*United States v. Eltayib*, 808 F.Supp. 160, 164 (E.D.N.Y.1992). Nothing in the record or in Eltayib's appellate argument causes us to doubt this finding. Eltayib does not claim that he attempted to invoke his right to silence or to counsel after the *Miranda* warnings were given, or that these attempts were ignored by law enforcement officials. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). We therefore affirm the district court's decisions to admit the passports and Eltayib's post-arrest statements.

### C. Ineffective Assistance of Counsel

■ Eltayib argues that his trial counsel was ineffective principally because he failed to utilize evidence from the Coast Guard's unsuccessful surveillance. Eltayib claims that this evidence might have indicated to the jury that the Blue Crown was not at the spot at which the drug transfer took place. Unless Eltayib can demonstrate that his attorney's performance fell below an objective standard of reasonableness and that, but for counsel's errors, he would not have been convicted, his ineffective assistance claim must fail. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Assuming, without deciding, that Eltayib's attorney failed to exploit the evidence from the Coast Guard's surveillance, this failure would not have affected the outcome. First of all, the only conclusion that one can draw from the Coast Guard's surveillance information is that it was wrong. The surveillance (based on an apparently malfunctioning radar system) first suggested that a drug transfer was occurring at point A, and then later at point B. Coast Guard patrol boats went to points A and B, and found at each spot that the Hunter was not there. Since it is uncontested that the drugs were transferred to the Hunter, the Hunter's location also marks the location of the drug transfer. The Coast Guard's radar readings, which are inconsistent with this undisputed fact, were demonstrably erroneous.

Even if the surveillance evidence were not disregarded, it could not generate a reasonable doubt unless the jurors simply disre-

garded the overwhelming evidence that linked the Blue Crown to the Hunter and the drug transfer location. Given the weight of the evidence, Eltayib cannot demonstrate that his case was prejudiced by his counsel's failure to adopt what was in any event an unpromising defense strategy. *See United States v. Aguirre*, 912 F.2d 555, 562 (2d Cir.1990) (a strong government case militates against finding prejudice as a result of any challenged defense tactic).

 Eltayib also claims that trial counsel was ineffective because he failed to object when Eltayib was compelled to appear throughout the trial in prison garb. Absent an objection at trial, a defendant cannot complain that he was forced to wear prison clothes in court. *Estelle v. Williams*, 425 U.S. 501, 512–13, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The Supreme Court intimated in *Estelle v. Williams* that it is a reasonable defense strategy "to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury," *id.* at 507–08, 96 S.Ct. at 1694–95, a consideration that bears upon whether a lawyer's failure to object falls below "an objective standard of reasonableness" under *Strickland.* Here, however, there is an additional factor. Eltayib claims that he actually urged his lawyer to object to his appearance in prison clothes, and that his lawyer nevertheless failed to object. The government has not responded to this claim, and there is nothing in the record, other than Eltayib's assertion, to indicate (i) whether Eltayib urged his lawyer to object, and if so, (ii) whether his lawyer ignored that request, and (iii) whether it would have been objectively unreasonable under the circumstances not to make such an objection despite Eltayib's request. Because the record is insufficient for us to make a decision on this issue, it would be more properly raised in a section 2255 petition in the district court, which could develop a full factual record. *See Billy–Eko v. United States*, 8 F.3d 111, 114 (2d Cir.1993) (where the record is murky, ineffective assistance of counsel claims should be decided on collateral review); *United States v. Matos*, 905 F.2d 30, 32 (2d Cir.1990) (ineffective assistance of counsel claim should usually be made to the district court for

factual findings). We decline to address the issue further.

*D. Conscious Avoidance Instruction*

 Where a defendant claims lack of knowledge but the evidence indicates that the defendant may have remained ignorant deliberately, it is proper to give a "conscious avoidance" instruction to the jury. *United States v. Boothe*, 994 F.2d 63, 69 (2d Cir. 1993). In the conspiracy context, conscious avoidance will not support a finding that a defendant knowingly participated in the conspiracy. *See United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir.1995) (it is "logically impossible for a defendant to intend and agree to join a conspiracy if he does not know that it exists"). However, if the defendant's participation in the conspiracy has been established, conscious avoidance may support a finding with respect to the defendant's knowledge of the objectives or goals of the conspiracy. *United States v. Aulicino*, 44 F.3d 1102, 1115 (2d Cir.1995); *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d. Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). Eltayib, Pena and Padilla claim that the district court's charge permitted the jury to consider conscious avoidance as a basis for establishing their participation in the conspiracy rather than their knowledge of the precise object of the conspiracy. Because none of them raised this objection at trial, we review only for plain error. Fed.R.Crim.P. 52(b); *United States v. Pabisz*, 936 F.2d 80, 83 (2d Cir.1991).

We believe the three defendants are misreading the charge. The court said:

[I]f you find that the conspiracy charged in the indictment existed, you must then decide whether a defendant joined the conspiracy with knowledge of its unlawful purpose.... [S]uch knowledge may be established by proof that the defendant was aware of a high probability that cargo on the vessel included drugs to be distributed in the United States, yet he deliberately refused to learn that fact.

On its face, the charge only allowed the jury to use conscious avoidance to establish that the defendants had "knowledge of [the con-

spiracy's] unlawful purpose," which is permissible under our precedents. And even if the instruction may be deemed ambiguous with regard to a finding that the defendants' participated in the conspiracy, another instruction made it clear that the finding of participation had to be explicit: "the evidence must show beyond a reasonable doubt that [the defendant] in some way associated himself with the venture and participated in it as something that he wished to bring about." We therefore hold that when the conscious avoidance instruction is read in light of the entire charge, there was no plain error.

## E. Sufficiency of the Evidence

 Padilla claims that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt. We view the evidence in the light most favorable to the government and ask whether any rational juror could have reached a finding of guilt beyond a reasonable doubt. *United States v. Maldonado–Rivera,* 922 F.2d 934, 979 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991); *United States v. Torres,* 901 F.2d 205, 216 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

 Padilla, chief engineer of the Blue Crown, argues that his "mere presence" as a crew member of the mother ship is insufficient evidence of his participation in the conspiracy to import cocaine or to possess cocaine with the intent to distribute. To prove conspiracy, it is sufficient to show that the defendant was present at a crime scene under circumstances that logically support an inference of association with the criminal venture. *See United States v. Benitez,* 920 F.2d 1080, 1089 (2d Cir.1990) (presence under particularly suspicious circumstances is sufficient to establish defendant's participation in a conspiracy); *United States v. DeWeese,* 632 F.2d 1267, 1272 (5th Cir.1980) (conspiratorial knowledge among crew members may be inferred from a variety of factors, including the length of the voyage, the quantity of contraband, and the necessarily close relationship between the captain and the crew members), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981).

A rational juror could have inferred from the circumstances that *any* crew member (much less the chief engineer) would have known the purpose of this odd voyage. First, a rational juror could have inferred that those in charge of such a voyage would not entrust the success of the operation to crew members who did not know its purpose, since uninformed crew members with a conscience might try to impede the voyage when they realized its true nature. *See United States v. Gordils,* 982 F.2d 64, 71–72 (2d Cir.1992), *cert. denied,* 507 U.S. 1054, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993); *United States v. Padilla,* 961 F.2d 322, 325 (2d Cir.), *cert. denied,* 506 U.S. 846, 113 S.Ct. 138, 121 L.Ed.2d 91 (1992).

In addition, even if Padilla initially had no knowledge of the voyage's purpose, its illicit nature would have become apparent during the course of the trip. The Blue Crown changed destinations in mid-course and took a circuitous route to New York that fortuitously bypassed Coast Guard anti-narcotics surveillance in the Caribbean. Once in Barbados, the Blue Crown's itinerary called for it to go to Newark for dry docking, apparently to fix a mechanical failure. Padilla, as chief engineer, would have known whether there was a mechanical problem. If there was none, he would have known there was no need to proceed to dry dock; and if there was such a problem, he would have realized that the problem could have been fixed in a nearby Caribbean dry dock. The jury could have reasonably inferred that the reason that the Blue Crown went north rather than to a dry dock in the Caribbean was that it had an objective that could not be delayed by mechanical repairs. A rational juror could believe that Padilla would have been privy to this decisionmaking process. Once the Blue Crown made it to the New York area, however, there was no attempt to dry dock the boat. Rather, the high-seas drug transfer was made, and the Blue Crown headed south again, anchoring in Salem, New Jersey—with no dry docks nearby. From the discordance between the Blue Crown's itinerary and its actual travels, a rational juror was entitled to conclude that there was no scheduled dry docking and that the ship's chief engineer

either knew that from the start, or learned it during the trip. When all of this evidence is combined with the highly unusual nature of the five-hour drug transfer, accompanied by a collision between the two boats, shouting, scraping steel plates, and airborne bales of cocaine, we think it obvious that a rational juror could have concluded that Padilla knew the illegal purpose behind the trip.[3] *See United States v. Guzman,* 754 F.2d 482, 489 (2d Cir.1985) ("reasonable persons" could conclude that "circumstances alone should have apprised defendants of the unlawful nature of their conduct"), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986). We therefore hold that the evidence was sufficient to support a finding of guilty beyond a reasonable doubt on the two conspiracy charges.

We also reject Padilla's contention as to the conviction for possession with intent to distribute. Dominion and control of contraband, either exclusively or in association with others, are sufficient to prove possession. *United States v. Rios,* 856 F.2d 493, 496 (2d Cir.1988) ("It is not necessary for a defendant to touch or exercise exclusive control over contraband to possess it.... What is required is sufficient indicia of dominion and control."). The Blue Crown officers (at the least) had dominion and control over the ship's cargo. A rational juror was therefore entitled to conclude that Padilla possessed the cocaine. *Cf. United States v. Pretel,* 939 F.2d 233, 238 (5th Cir.) (all crew members on ship exercised dominion and control over the contraband), *cert. denied,* 502 U.S. 918, 112 S.Ct. 327, 116 L.Ed.2d 267 (1991); *United States v. Gonzalez,* 810 F.2d 1538, 1543 (11th Cir.1987) (constructive possession may be proved by demonstrating that a defendant worked on a small vessel that is heavily laden with narcotics and that defendant had knowl-

edge of the presence of the narcotics on board).[4]

### F. Prosecutorial Misconduct

Eltayib contends that the government engaged in prosecutorial misconduct during summation and before the grand jury. An improper summation requires a new trial only where the improper statements cause "substantial prejudice" to the defendant. *United States v. Modica,* 663 F.2d 1173, 1181–84 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). *See also United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) ("a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone").

Quoting our opinion in *United States v. Thai,* 29 F.3d 785, 807 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994), Eltayib points out that a prosecutor "may not properly vouch for the credibility of a witness." Eltayib points to several points in the prosecutor's summation in which he prefaced his argument that Van Salisbury's testimony was reliable and credible with the phrase "I submit that". The problem with a prosecutor's use of the pronoun "I" is that it "tends to make an issue of [the prosecutor's] own credibility, or to imply the existence of extraneous proof." *United States v. Rivera,* 22 F.3d 430, 438 (2d Cir.1994) (quotations, alterations and citations omitted). It is strictly "improper for a prosecutor to interject personal beliefs into a summation," and we have therefore stressed that "it is a poor practice ... for prosecutors to frequently use rhetorical statements punctuated with excessive use of the personal pronoun 'I.'" *United States v. Nersesian,* 824 F.2d 1294, 1328 (2d Cir.1987), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). We have provided ex-

---

**3.** We quickly reject Padilla's claim that there was insufficient evidence to demonstrate that he knew the drugs were intended for the United States. The drug transfer occurred just off the coast of New York, and the jury could reasonably have concluded that the chief engineer knew where he was.

**4.** Eltayib joins all argument made by his co-appellants, pursuant to Fed. R.App. P. 28(i). The

insufficiency argument is the only one made by Padilla or Pena that is not made by Eltayib. Our reasons for rejecting Padilla's "mere presence" argument apply equally to Eltayib, and are fortified by Eltayib's handwriting in the log book and on the slip of paper with coordinates found in the chartroom. We therefore reject the insufficiency argument as to Eltayib as well.

amples of alternate language that would allow the prosecutor to argue for the credibility of its witnesses based on the evidence, without injecting the prosecutor's personal beliefs into the case:

It is a perfectly acceptable practice for a prosecutor to use language in addressing the jury such as "you are free to conclude," "you may perceive that," "it is submitted that," or "a conclusion on your part may be drawn," to mention only a few examples of unobjectionable phraseology. It is obligatory for prosecutors to find careful ways of inviting jurors to consider drawing argued inferences and conclusions and yet to avoid giving the impression that they are conveying their personal views to the jurors.

*Id.*

■ On the other hand, a prosecutor's use of the pronoun "I" does not automatically wreck the case. First, even though phrases such as "I think it is clear," or "Does it makes sense—I think it does," are not "acceptable," they do not merit reversal unless "the summation viewed as a whole ... reflect[s] improper vouching." *Id.* Second, not all uses of the pronoun "I" are improper. In *Modica*, for instance, we suggested that the prosecutor's use of "I suggest that" was proper, because it "shied away from an outright endorsement," but that the use of "I'm here to tell you that" was improper, because it "convey[ed] to the jurors his personal view that a witness spoke the truth." 663 F.2d at 1177 & 1178. And in *Rivera*, we found acceptable the prosecutor's use of the phrase "I submit to you that," in light of the defense counsel's accusations during its summation that the testimony of the government's informant was fabricated. 22 F.3d at 438. We explained that "the government is allowed to respond to argument that impugns its integrity or the integrity of its case." *Id.*

Based on these precedents, we think it clear that the prosecutor's use of the phrase "I submit that" on numerous occasions in this case was not improper. First, the defendants' lawyers specifically attacked Van Salisbury's credibility and veracity in their summations. Since this "impugn[ed] the integrity of [the government's] case," as in *Rivera*, the prosecutor was entitled to respond with counter-arguments. Second, the statements that followed the "I submit that" phrase either (i) relied on evidence in the case to corroborate Van Salisbury's testimony, or (ii) asked the jurors to draw inferences based on their common sense that would lead to the conclusion that Van Salisbury had no motive to lie to the government. Neither type of statement injected the prosecutor's personal beliefs or opinions into his argument, or suggested that unrevealed information in the government's investigative files established the witness's veracity. Finally, the phrase "I submit" expresses not a personal belief but a contention, an argument, which, after all, is what a summation to the jury is meant to be. The well-advised prosecutor will sidestep all uses of the pronoun "I," but we conclude that the phrase "I submit" is not improper in these circumstances. *See id.* (statement preceded by "I submit to you that" not impermissible).

Eltayib also argues that prosecutors improperly commented on the defendants' decision not to testify by saying, "they know how to keep their mouths shut." At trial, Eltayib moved for mistrial based on this comment. The district court denied the motion but instructed the jury that

someone who is arrested doesn't have any duty to say anything. In fact, you can't draw any inference adverse to someone just because they have not answered or said anything after they have been arrested.

This instruction was sufficient to cure the error. Because of this instruction and the likelihood of conviction even in the absence of the prosecutor's statement, reversal is not warranted.

■ Eltayib also argues that his indictment must be dismissed for prosecutorial misconduct before the grand jury. In light of the Supreme Court's pronouncement that a guilty verdict by a petit jury remedies any possible defects in the grand jury indictment, *United States v. Mechanik*, 475 U.S. 66, 72–73, 106 S.Ct. 938, 942–43, 89 L.Ed.2d 50 (1986), this claim also fails.

### G. Sentencing/Downward Departure

Finally, Eltayib argues that he was a "minimal participant" in the trafficking scheme and that he therefore was entitled to a four-level reduction in his offense level under § 3B1.2(a) of the Sentencing Guidelines. Eltayib's argument proceeds along two lines. First, he argues that in declining to grant him a "minimal participation" adjustment, the court applied incorrect legal principles by ruling that his status as an officer and the large quantity of drugs in the case automatically precluded such an adjustment as a matter of law. The record indicates that the court believed Eltayib failed to merit the adjustment because of the specific circumstances of this case, and not because of any categorical legal rule. There was therefore no legal error. Second, Eltayib argues that he met his burden of establishing his "minimal" participation. A defendant is a "minimal" participant only if he is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, App. Note 1. Determining whether to grant an adjustment because of a defendant's limited role in the offense is "highly fact-specific" and is reviewed for clear error. *United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir. 1993); *United States v. Soto*, 959 F.2d 1181, 1187 (2d Cir.1992). The evidence that Eltayib played an active role in navigating the Blue Crown on its suspicious course and in directing it to the drug transfer location (not to mention his status as captain) support the district court's decision to refuse a four-level reduction for minimal participation. There was no clear error.

\* \* \* \* \* \*

The judgment of the district court is affirmed.