James J. JONES, # 85–C–0146, Petitioner,

v.

John P. KEANE, Superintendent, Respondent.

No. 99–CV–0149E(F).

United States District Court, W.D. New York.

Dec. 10, 2002.

James J. Jones, Warwick, NY, pro se.

Frank J. Clark, Dist. Atty., Joseph J. Notaro, Assist. Dist. Atty., of counsel, Buffalo, NY, for respondent.

## MEMORANDUM and ORDER [1]

ELFVIN, District Judge.

Petitioner Jones, currently incarcerated in a New York State prison and serving an indeterminate term of imprisonment of twenty years to life following a conviction in New York State Supreme Court, Erie County, filed a petition for a writ of habeas corpus October 30, 1998 [2] pursuant to 28 U.S.C. § 2254 on the following grounds: (1) that the indictment against him was the result of an improperly granted resubmission motion for presentation by the district attorney to a second grand jury; (2) that, as a result of such fraud, the grand jury and the trial and appellate courts did not have subject matter jurisdiction over his case; (3) that the alleged fraudulent indictment violated his constitutional rights under the Fourth, Fifth and Fourteenth Amendments; (4) that he had been denied effective assistance of counsel; (5) that he had been denied due process based on alleged prosecutorial misconduct; (6) that the verdict that convicted him had been against the weight of the evidence; (7) that the state court's ruling with regard to a pre-trial *Sandoval* [3] hearing was erroneous; and (8) that the trial court erroneously permitted petitioner to conduct a *pro se* examination of a witness.[4] Pursuant to 28 U.S.C. § 636(b)(1)(B), the petition was referred to Magistrate Judge Leslie G. Foschio for an evaluation of the merits of the factual and legal issues raised by petitioner and a recommended disposition. Judge Foschio filed on July 26, 2002 a Report and Recommendation ("R & R") in which he recommended that the petition be denied in its entirety. Jones timely filed his objections to the R & R and oral argument was heard on this matter by the undersigned September 27, 2002.

While familiarity with the facts of this case is presumed, relevant facts will be discussed as needed.[5] Jones shot and killed a man named Allen Cleague on November 2, 1980. Jones has never disputed that he shot and killed Cleague, but rather he has always maintained that Cleague displayed a weapon and that Jones shot

---

**1.** This decision may be cited in whole or in any part.

**2.** Petitioner filed the instant petition October 30, 1998 in the Southern District of New York; however such was transferred to this Court pursuant to a February 22, 1999 Transfer Order by U.S. District Judge Thomas P. Griesa.

**3.** *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974).

**4.** Jones' first four causes of action were alleged in his original October 30, 1998 petition; his last four causes of action were added as part of an August 9, 1999 Amended Petition. *See* Am. Pet., pp. 4–8.

**5.** A more detailed recitation of the facts and procedural history in this case is set out in Magistrate Judge Foschio's R & R.

Cleague in self-defense. Tr. 947–950.[6] Following the shooting and a subsequent investigation, the Erie County District Attorney presented the case to a grand jury. The grand jury returned a no bill on February 10, 1981.[7] Thereafter, the Erie County District Attorney filed a Motion for Resubmission to the Grand Jury pursuant to N.Y.Crim. Proc. Law § 190.75(3)(Mckinney 1993) in New York County Court, County of Erie.[8] Such motion was granted June 17, 1983. Jones was indicted August 23, 1983 for second degree murder and criminal possession of a weapon in the second degree. Following an eight-day jury trial, Jones was convicted of second degree murder on December 19, 1984.[9] Jones subsequently filed several unsuccessful appeals and petitions for habeas corpus relief with various New York State courts.[10] His present petition for a writ of habeas corpus is now before this Court for disposition.

In recommending that Jones' petition be denied, Judge Foschio specifically found that there was no basis to grant habeas corpus relief based on Jones' first four causes of action because his challenge to the District Attorney's resubmission motion did not give rise to any constitutional violation. See R & R, pp. 17–21. In addition, Judge Foschio concluded that Jones had failed to demonstrate prosecutorial misconduct or that the verdict which resulted in his conviction was against the weight of the evidence. Id. at 21–30. Lastly, Judge Foschio found no merit to Jones' seventh and eighth causes of action because the Sandoval ruling in the state court was not so prejudicial as to constitute "fundamental unfairness" and because the state court's decision to allow Jones to examine a witness pro se resulted in no prejudice to Jones. Id. at 30–34.

◼ Pursuant to 28 U.S.C. § 636(b)(1), this Court has conducted a de novo review of those portions of the R & R to which Jones objects and finds no merit to any such objection. Petitioner's objections consist of nothing more than his attempt to reargue his first four causes of action contained within his habeas corpus petition. In particular, Jones argues that the entire R & R is totally irrelevant because Judge Foschio "leapfrogged" over his jurisdictional argument – viz., that the District Attorney's resubmission motion had been improperly granted and therefore precluded the Grand Jury from having jurisdiction over him. See Pet'r's Obj. to the R & R, p. 13. Such an argument is without merit because, as Judge Foschio exhaustively explained in his R & R, petitioner's allegation that the state grand jury proceeding was erroneous or improper cannot provide the basis for federal habeas corpus relief in this case because any defect in the grand jury was cured by Jones' conviction before the petit jury.[11] See Lopez v. Riley,

---

6. "Tr." citations are references to page numbers of the state court trial transcript.

7. Pertinent to such decision was the fact that two witnesses, Gloria Jackson and Melinda Gay Waker, testified before the Grand Jury that Jones shot Cleague in self-defense after Cleague had threatened him with a pistol. See Tr. 252–257, 371.

8. The Resubmission Motion was based primarily on the fact that both Jackson and Waker had recanted their previous Grand Jury testimony with respect to Jones' self-

defense claim. See People's Resubmission Mot., pp. 2–4.

9. The second count of criminal possession of a weapon was dismissed. Tr. 1275–1277.

10. See e.g. People v. Jones, 156 A.D.2d 934, 548 N.Y.S.2d 824 (App. Div. 4th Dep't.1989); People v. Jones, 75 N.Y.2d 869, 553 N.Y.S.2d 300, 552 N.E.2d 879 (Table) (1990).

11. That is of course assuming, arguendo, that there was some kind of fraud or error connected with the second grand jury. In that

865 F.2d 30, 32 (2d Cir.1989); *see also Velez v. People,* 941 F.Supp. 300, 316 (E.D.N.Y.1996); *Barnes v. Giambruno,* 2002 WL 850020, *7 (S.D.N.Y.2002). Petitioner has simply failed to direct this Court to any cognizable constitutional violations that may have occurred during the state court proceedings.[12]

Accordingly, it is hereby **ORDERED** that petitioner's Objections are overruled, that Judge Foschio's July 16, 2002 R & R is adopted in its entirety, that petitioner's motion for summary judgment is denied,[13] that the October 30, 1998 petition for a writ of habeas corpus and the August 9, 1999 amended petition for a writ of habeas corpus are dismissed in their entirety, that this case shall be closed and that there is no substantial question presented for appeal and therefore a certificate of appealability will not be issued.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

Petitioner initiated this action requesting habeas corpus relief under 28 U.S.C. § 2254 on March 3, 1999. The matter was referred to the undersigned by the Honorable John T. Elfvin on July 23, 1999 for all proceedings necessary to reach a determination in this matter.

### *BACKGROUND*

The presentation to an Erie County Grand Jury of evidence regarding an investigation into Petitioner James J. Jones's involvement in the November 2, 1980 shooting death of Allen Cleague initially resulted in a no bill returned on February 10, 1981. Testifying before the Grand Jury were Gloria Jackson and Melida Gay Waker[1] who stated that Petitioner shot the victim in self-defense after the victim threaten Petitioner with a pistol. By written statements dated April 30 and May 2, 1983, both Waker and Jackson recanted their Grand Jury testimony. Based on those statements, the Erie County District Attorney moved to resubmit the case to the Grand Jury and the motion was granted on June 17, 1983.

On August 23, 1983, an Erie County Grand Jury returned a two-count Indictment charging Petitioner with murder in the second degree and criminal possession of a weapon in the second degree, in violation of New York Penal Law §§ 125.25(1) and 265.03 (McKinney 1999). An eight-day trial commenced on December 5, 1984 and ended on December 19, 1984 with Petitioner convicted on the murder charge. Petitioner was sentenced on February 11, 1985 to an indeterminate term of incarceration of twenty years to life.

Petitioner timely appealed his conviction to the New York State Supreme Court of Appeals, Fourth Department which unanimously affirmed the conviction on Decem-

regard, Jones has not presented sufficient evidence to convince this Court that the grand jury proceeding was improper or erroneous in any way.

**12.** No further discussion is needed regarding petitioner's fifth, sixth, seventh and eighth causes of action as they are sufficiently addressed in Judge Foschio's R & R and are approved.

**13.** Petitioner filed a motion for summary judgment December 14, 2001 with respect to

his petition for a writ of habeas corpus. Such motion will be denied as moot inasmuch as the arguments contained therein are identical to the arguments contained within Jones' petition for habeas corpus.

**1.** Waker was Melida's married surname at the time of the trial whereas, at the time of the shooting, she was single and her maiden name was Gay.

ber 20, 1989. *People v. Jones*, 156 A.D.2d 934, 548 N.Y.S.2d 824 (App. Div. 4th Dep't 1989). On direct appeal, Petitioner challenged (1) denial of due process in violation of the Fifth and Fourteenth Amendments based on alleged prosecutorial misconduct before the Grand Jury; (2) the verdict was against the weight of the evidence; (3) the trial court's ruling following a *Sandoval* hearing,[2] was erroneous; and (4) the trial court improperly permitted the *pro se* examination of a witness. In a *pro se* brief submitted in further support of his appeal, Petitioner argued that prosecutorial misconduct at trial deprived him of a fair trial, and that the verdict was against the weight of the evidence. On January 29, 1990, Petitioner moved for leave to appeal to the New York Court of Appeals, raising essentially the same grounds as raised on his direct appeal. Leave to appeal to the Court of Appeals was denied on February 27, 1990. *People v. Jones*, 75 N.Y.2d 869, 553 N.Y.S.2d 300, 552 N.E.2d 879 (1990).

By petition dated March 9, 1993, Petitioner sought a writ of habeas corpus in New York Supreme Court, Erie County, arguing that the prosecution's motion to resubmit the case to the Grand Jury was "fraudulent" and, therefore, the Indictment was void. The writ was denied on June 1, 1993 as an improper collateral attack on the conviction.[3]

By motion filed July 9, 1996, Petitioner moved to vacate the conviction pursuant to New York Criminal Procedure Law § 440, arguing that (1) the trial court lacked subject matter and *in personam* jurisdiction; (2) the Indictment was fraudulently obtained; (3) newly discovered evidence would have exculpated Petitioner; and (4) the judgment was obtained in violation of Petitioner's state and federal constitutional rights. The motion was denied on April 22, 1997. Leave to appeal to the New York Court of Appeals was denied on December 3, 1997.[4]

Petitioner filed the instant petition on October 30, 1998 in the Southern District of New York, asserting four grounds for relief, each essentially challenging the propriety of the District Attorney's resubmission of the case to the Grand Jury. Specifically, Petitioner seeks federal habeas relief on the basis that (1) the case was resubmitted to the state Grand Jury based on false evidence; (2) such falsehoods rendered the Grand Jury, trial and appellate courts without subject matter jurisdiction over the case; (3) the allegedly fraudulently obtained Indictment violated his constitutional rights under the Fourth, Fifth and Fourteenth Amendments; and (4) he was denied effective assistance of counsel when his trial counsel failed to seek dismissal of the Indictment based on the alleged fraudulent resubmission to the Grand Jury. Petition, ¶ 12(A)-(D). Petitioner's motion incorporates by reference all points raised by counsel on his direct appeal of his con-

---

2. A *Sandoval* hearing is a pretrial hearing where the trial judge makes a determination as to whether any prior convictions or proof of any prior commissions of specific uncharged crimes or bad acts may be admitted into evidence at a criminal trial. *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974). In determining whether to admit evidence of other crimes, a balance must be struck between the probative worth of the evidence and the risk of unfair prejudice to the defendant. *Sandoval, supra,* at 416.

3. A copy of the unpublished order denying Petitioner's application to New York Supreme Court for a writ of habeas corpus is submitted as Respondent's Exhibit D.

4. A copy of the unpublished order denying Petitioner's request to appeal the Appellate Court's denial of his § 440 motion to vacate to the Court of Appeals is submitted as Respondent's Exhibit E.

viction, as well as in his motion to vacate pursuant to N.Y.Crim. Pro. Law § 440.

By Order of February 22, 1999, the petition was transferred to this court as the events giving rise to the petition occurred within the Western District of New York. *See* 28 U.S.C. § 2241(d) (venue for habeas corpus petitions brought under 28 U.S.C. § 2254 is proper in either the district in which the petitioner is in custody or the district in which the petitioner's conviction was obtained). By Order filed March 12, 1999, Petitioner was directed to show cause why the petition is not time-barred, given that more than one year had elapsed since the conviction became final. On June 11, 1999, Petitioner filed a response to the request and on July 6, 1999, the petition was deemed timely. On August 17, 1999, Respondent filed an Answer (Docket No. 15), a Memorandum of Law (Docket No. 16) ("Respondent's Memorandum"), and the state court records pertaining to Petitioner's conviction.

In an Amended Petition filed as of right on August 9, 1999 (Docket No. 14), Petitioner re-asserts the same four grounds for relief asserted in the original petition, and four additional grounds including (1) denial of due process based on prosecutorial misconduct before the Grand Jury and at trial; (2) the verdict was against the weight of the evidence; (3) the trial court's ruling following a *Sandoval* hearing was in error; and (4) the trial court erroneously permitted Petitioner to examine a witness *pro se*.[5] Amended Petition, p. 8. On October 8, 1999, Respondent filed an Answer to the Amended Petition (Docket No. 19) and a Memorandum of Law addressing the additional grounds for relief (Docket No. 20) ("Respondent's Amended Memorandum"). On November 10, 1999, Petitioner filed a traverse in reply to Respondent's Answer to the Amended Petition and Amended Memorandum (Docket No. 21) ("Traverse").

On February 20, 2001, Petitioner filed a document entitled "Omnibus Motion" (Docket No. 22), seeking an order directing the undersigned to issue findings of fact and law regarding the merits of the petition, and summary judgment. This court's September 7, 2001 order directed that the motion be treated as a Petition for Writ of Mandamus. On December 13, 2001, Respondent filed a response to the mandamus petition (Docket No. 24). On January 10, 2002, Petitioner filed a reply in further support of mandamus relief (Docket No. 27).

On December 14, 2001, Petitioner filed a motion for summary judgment (Docket No. 27). On February 13, 2002, Petitioner moved for rescission of this court's January 9, 2002 order setting deadlines for Respondent to file papers responsive to Petitioner's summary judgment motion (Docket No. 28). On May 28, 2002, Petitioner moved to expedite this court's decision on his summary judgment motion (Docket No. 29). An amended motion to expedite was filed on May 12, 2002 (Docket No. 30). Oral argument on the petition and subsequent motions was deemed unnecessary.

Based on the following, the court finds no merit to any of Petitioner's claims. As such, the motion for summary judgment (Docket No. 27) should be DENIED; the Petition (Docket No. 1), the Amended Petition (Docket No. 14) and the mandamus

---

**5.** An amendment to a petition for habeas relief is not treated as a second or successive petition but, rather, is considered as an amended pleading which is governed under Fed.R.Civ.P. 15. *Littlejohn v. Artuz*, 271 F.3d 360, 362–64 (2d Cir.2001). Because Respondent had yet to file an answer as of August 9, 1999, the Amended Petition was filed as of right. Fed.R.Civ.P. 15(a).

petition (Docket No. 22) should be DIS-MISSED, the motion for rescission of this court's briefing schedule (Docket No. 28) is DENIED; the motion to expedite (Docket No. 29) and the amended motion to expedite (Docket No. 30) are DISMISSED as moot.

### FACTS

Petitioner James J. Jones ("Jones"), challenges his second degree murder conviction for the November 2, 1980 shooting death of Allen Cleague inside the Peyton Place Lounge ("the bar") located in Buffalo, New York. It is undisputed that Jones, accompanied by Melida Gay Waker and Gloria Jackson, was inside the bar that evening. (T. 1032).[6] It is also undisputed that Jones engaged in an argument with the bartender, Ossie Mae Shaw, over the bartab, in which Cleague intervened on behalf of Shaw, angering Jones. (T. 91–98, 103, 236, 242, 286, 330, 346, 937–39). Jones returned to his seat near the bar and when Cleague started toward the exit, Jones shot Cleague in the back. (T. 245, 355–57, 520–21).

Cleague fell to the floor and Jones knelt over his body. Jackson and Waker testified they believed that Jones was administering mouth-to-mouth resuscitation (T. 292, 357), while witnesses Geraldine Tate and Nora Coleman each testified they saw Jones, upon going through Cleague's clothes, pull out a gun and place it next to Cleague's body. (T. 489, 519). A starter pistol, incapable of firing a bullet, was found near Cleague's body after the shooting. Jones has never denied shooting Cleague with a gun retrieved from Waker's purse; rather, Jones maintains that Cleague displayed a weapon in his hand, causing Jones to shoot Cleague in self-defense.

In appearances before an Erie County Grand Jury on January 15, 1981, Waker and Jackson each testified to having seen Cleague reach for a gun and threaten Jones who responded by shooting Cleague in self-defense. The Grand Jury returned a no bill on February 10, 1981.

By written statements respectively dated April 30 and May 2, 1983, Waker and Jackson recanted their January 15, 1981 Grand Jury testimony, stating instead that Jones shot Cleague in the back as Cleague was walking out of the bar and that Jones had pressured Waker and Jackson initially to lie to the police. The prosecutor moved pursuant to N.Y.Crim. Pro. Law § 190.75(3) for leave to resubmit the case to the grand jury based on newly discovered evidence, i.e., the April 30 and May 2, 1983 statements. The motion was granted on June 17, 1983 and the case was resubmitted to the Grand Jury which returned the Indictment on August 23, 1983.

Jones, represented by E. Carey Cantwell, Esq., was tried in New York Supreme Court, Erie County, before Honorable Vincent E. Doyle. Prior to the commencement of the jury trial, a *Sandoval* hearing was held on December 5, 1984, to determine whether evidence of prior bad acts could be introduced at trial against Jones. Justice Doyle ruled, *inter alia*, that should Jones take the stand in his defense, he could be questioned as to an allegation pending before another Erie County Grand Jury that Jones raped Jackson's minor daughter. (T. 13–16).

Several of the prosecution's witnesses, including Geraldine Tate and Nora Coleman, testified consistently at trial that Cleague did not have a gun in his hand when he was shot. (T. 487 (Tate), and 519 (Coleman)). Rather, Tate and Coleman

---

**6.** "T." references are to the page number of the trial transcript.

each testified that after Cleague fell to the floor, Jones went through Cleague's clothing from which Jones pulled a gun and placed it on the floor next to Cleague's body. (T. 489 (Tate), 519 (Coleman)). Gary testified that she first saw the starter pistol laying on the floor next to Cleague's body after Jones stood up and walked away. (T. 460). The bartender, Ossie Mae Shaw, testified that after Cleague was shot, she observed Jones reach into Cleague's coat, pull out a small back gun, and place it on the floor. (T. 109–110, 151–52).

Testimony by Jackson and Waker also negated Jones's self-defense theory as well as called his character into question. Specifically, both Jackson and Waker described their respective relationships with Jones as one in which Jackson and Waker gave their public assistance checks to Jones out of which Jones paid their rent and bills and returned between five to twenty dollars to each of them for spending money. (T. 232–24, 340). Pursuant to this arrangement, Jackson and Waker lived in various apartments owned by Jones including 32 Sweeney Street where Jones lived with his wife and children. (T. 233–34, 268). As of November 2, 1980, Jackson, her two children and Waker resided together in an apartment located at 82 Rich Street in Buffalo, around the corner from Jones's Sweeney Street residence. (T. 343).

On November 2, 1980, Jones arrived at 82 Rich Street to pick up Jackson and Waker to go out. (T. 235, 268, 341). Prior to leaving the apartment, Jones handed Waker a gun, instructed her to put it in her purse and Waker complied. (T. 236–38, 276–77, 342). The trio went to Peyton Place Lounge where they sat near the bar and had drinks. (T. 238–40, 278, 281, 346). Later, Jones and the bartender argued over the bar tab and Cleague eventually joined in the argument. (T. 241–44, 282–83, 346, 348–51).

Jones and Cleague continued arguing and Jones directed Jackson and Waker to put on their coats because they were about to leave. (T. 244, 285–87). Cleague walked around the bar and continued to argue with Jones who retrieved the gun from Waker's purse and shot Cleague. (T. 244–45, 287, 354). Cleague did not physically threaten or touch Jones in any way prior to the shooting. (T. 245, 328, 353, 356). Jackson and Waker recalled that Jones fired between two and five shots. (T. 246, 287, 291, 355).

After Cleague fell to the floor, Jones instructed the others inside the bar not to move, approached Cleague's body and appeared to give Cleague mouth-to-mouth resuscitation. (T. 246–47, 287, 292, 357). The police arrived and arrested Jones; Waker was taken to the police station for questioning, while Jackson was allowed to leave after providing her name and giving a statement. (T. 249–50, 358).

A few days after the shooting Jackson, at the request of Jones's wife, went to the Erie County Holding Center where Jones was being detained and spoke with Jones. (T. 250, 315). Jones told Jackson that Cleague had a gun and that Jackson and Waker should make sure their stories were consistent when they testified before the Grand Jury. (T. 251, 299, 303). Waker was also instructed by Jones and his wife to testify before the Grand Jury that Jones shot Cleague in self-defense after observing that Cleague had a gun. (T. 363, 368–71). Jackson and Waker conferred and agreed as to the version of the events of November 2, 1980 that they would relate before the Grand Jury. (T. 304–05).

When Jackson initially testified before the Grand Jury, she falsely stated that she observed Cleague retrieve a small pistol from his coat just before he was shot. (T.

252–53, 256–57, 303–12). Waker likewise testified that Jones shot Cleague because Cleague "pulled a gun on [Jones]." (T. 371).

Both Jackson and Waker later recanted their initial Grand Jury testimony. Jackson explained that she feared Jones would beat her if she did not testify in accordance with Jones's direction. (T. 251–52). Jackson had been beaten by Jones on several occasions. (T. 325–28). On one occasion Jones tied Jackson up in the attic of Johnson's home, beat her with a curtain rod, and left her in the attic overnight. (T. 325). On another occasion, Jones fractured Jackson's jaw. (T. 327). On yet another occasion, Jones beat Jackson, punching her in the stomach because she was unable to testify on his behalf at a court hearing. (T. 328). Jackson maintains she agreed to live in Jones's apartments under their rental arrangement out of fear of Jones. (T. 315–17). Jackson was hospitalized for depression in 1982, stemming from her fear of Jones. (T. 273–74). According to Jackson, in 1982 she became tired of the beatings and had learned that Jones was sexually assaulting her daughter. (T. 274, 321). Jackson moved out of the apartment she rented through Jones in 1982 and, in May 1982, brought charges against Jones for the sexual abuse of her daughter. (T. 274–75, 321, 324).

Jackson gave the Buffalo Police a written statement dated May 2, 1983, and appeared before a second Grand Jury on June 30, 1983 when she admitted that her January 15, 1981 Grand Jury testimony was perjury. (T. 312–13). Jackson explained that she perjured herself because she feared Jones, (T. 313), but that she no longer feared Jones and decided to tell the truth. (T. 314). Jackson further testified that she wanted to see Jones dead or incarcerated. (T. 276, 316).

Although Jones was represented by Mr. Cantwell at trial, Jones insisted on recalling Jackson and conducting a separate examination of Jackson to elicit from Jackson, who testified that she had sexual relations with Jones (T. 266), that she changed her Grand Jury testimony when her feelings of affection for Jones were unrequited. *See* T. 1148–60. When Jones encountered difficulty in eliciting the anticipated testimony from Jackson, Cantwell completed the examination of Jackson for him. (T. 1160–64). Jackson's testimony upon being recalled was essentially a reiteration of her earlier testimony regarding her fear of Jones. *Compare* T. 197–331 (initial direct and cross examination) with T. 1148–60 (subsequent direct examination commenced by Jones).

In her April 30, 1983 statement to the police, Waker explained that she committed perjury when testifying before the Grand Jury on January 15, 1981. According to Waker, her initial Grand Jury testimony that Jones shot Cleague after Cleague pulled a gun on Jones was given pursuant to the direction of Jones. (T. 362–64). Waker stated that Jones threatened to harm her and Jackson if they did not testify consistent with each other and in accordance with Jones's directions. (T. 362–63). Waker also testified that Jones had beaten her "so many times [that it was] hard to remember." (T. 445–46).

Jones testified before the second Grand Jury.[7] Jones also testified on his own behalf at trial. (T. 973–1140). Upon cross-examination, Jones was questioned with regard to his past employment, stating

---

7. Although the transcripts are not in the record, Respondent does not deny that Jones testified before the second Grand Jury.

that he had previously worked as a pipefitter (T. 996), a hypnotist (T. 997) and a real estate manager (T. 997). In response to questioning, Jones explained that he provided counseling to people and that some people referred to him as a doctor, although he himself did not. (T. 998). Jones was aware that Jackson was undergoing psychiatric treatment for depression for which she took prescription medication. (T. 1001–04). Jones admitted that he had signed papers for Jackson's psychiatric treatment as "Dr. Jones." (T. 1130). Jones testified he became certified to hypnotize people by taking a three day course offered through the mail and that following his certification, he taught a course in hypnotism to others for a fee. (T. 1027–28). Jones was questioned as to his relationship with Jackson's minor daughter whom he was accused of raping and with whom he denied having any sexual relations. (T. 1029–31). Jones admitted he had sexual relations with Waker. (T. 1031).

## DISCUSSION

■ In reviewing habeas petitions, federal courts do not function as appellate courts to review matters within the jurisdiction of the state, or to review rulings and decisions of state trial and appellate courts; rather, the court determines whether the proceedings in the state court amount to a violation of federal constitutional rights. *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). Federal review of a state court conviction is limited to errors of federal constitutional magnitude which denied a criminal defendant the right to a fundamentally fair trial. *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). A state prisoner applying for a writ of habeas corpus under 28 U.S.C. § 2254 is not entitled to an evidentiary hearing by the federal

court, but the granting of a hearing is within the discretion of the federal district court. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 4–5, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (citing *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)); *Pagan v. Keane,* 984 F.2d 61, 63 (2d Cir. 1993). The state court's determination as to evidentiary matters, however, is presumed to be correct unless one of the specified conditions pursuant to 28 U.S.C. § 2254(e), formerly 28 U.S.C. § 2254(d), is found to exist or unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Absent these factors, the burden rests on the petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous. *Sumner, supra.*

In the instant petition, Jones asserts eight grounds for habeas relief, including: (1) the resubmission of the case to the Grand Jury was not justified by new evidence; (2) lack of subject matter jurisdiction based on the alleged improper resubmission to the Grand Jury; (3) denial of a fair trial based on the alleged improper resubmission to the Grand Jury; (4) trial counsel's failure to challenge the resubmission to the Grand Jury violated his right to effective assistance of counsel; (5) prosecutorial misconduct based on the prosecutor's comments in his opening statement and on summation, as well as remarks that demeaned, badgered and insulted Jones; (6) the verdict was against the weight of the evidence; (7) the trial court's *Sandoval* ruling was erroneous; and (8) the trial court improperly permitted Jones to conduct a *pro se* examination of a prosecution witness, Gloria Jackson. Petition, ¶ 12. The court is in possession of the state records relevant to Jones's claims, including the trial transcript and the *Sandoval*

hearing. Upon review of the record, the court finds that each of the grounds raised by Jones may be decided as questions of law based on the state court records. Accordingly, no evidentiary hearing is necessary, and the court turns its attention to the merits of the Petition.

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act ("the AEDPA") in 1996, questions of law and mixed questions of law and fact for § 2254 petitions were subject to *de novo* review. *Rudenko v. Costello*, 286 F.3d 51, 68–69 (2d Cir.2002); *Sellan v. Kuhlman*, 261 F.3d 303, 309–10 (2d Cir.2001). Since the AEDPA's enactment, such questions which the state court has resolved on the merits are subject to deferential review. *Id.* Although Jones filed his petition for habeas relief after the effective date of the AEDPA, the court reviews his claims under pre-AEDPA standards in accordance with the Second Circuit's recent instructions as it is not possible to determine whether the state court resolved the issues raised on their merits. *Rudenko, supra; Sellan, supra.* Specifically, in *Rudenko*, the court held that where, as here, it was not possible to determine whether the state court had determined a federal constitutional issue on its merits, the federal constitutional claims are considered as not having been determined on the merits and, as such, are subject to *de novo*, rather than deferential, review.[8] *Rudenko, supra*, at 68–69.

Generally, erroneous evidentiary rulings do not rise to the level of constitutional error sufficient to warrant habeas relief. *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir.1988); *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir.1985); *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983). A *"per se"* reversal rule applies to "[s]tructural errors [which] are fundamental defects in the trial mechanism that affect the entire framework within which the trial proceeds," thereby "defy[ing] analysis by harmless error standards." *Peck v. United States*, 106 F.3d 450, 454 (2d Cir.1997) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and *Brecht v. Abrahamson*, 507 U.S. 617, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)) (internal quotations omitted). However, erroneous evidentiary rulings are trial errors, rather than structural errors. *Lyons v. Johnson*, 99 F.3d 499, 502 n. 5 (2d Cir.1996). This distinction is significant as trial errors are subject to harmless error analysis. *Peck, supra*, at 454.

To determine whether an error is harmless, the court must examine the totality of the circumstances, including all of the evidence and the jury instructions. *United States v. Pimentel*, 83 F.3d 55, 59 (2d Cir.1996) (citing cases). Habeas or other collateral relief must be granted if the constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict." *Peck, supra*, at 454 (quoting *Brecht, supra*, at 637, 113 S.Ct. 1710). Further, "[o]n collateral

8. The only issue raised in the habeas petition on which the Appellate Division, Fourth Department reached the merits is whether the trial court erred in permitting the prosecution to question Jones as to the pending sexual abuse charges, although it is not clear whether the merits were determined under state procedural or federal constitutional law. *People v. Jones, supra*, at 824. Otherwise, the Appellate Division, Fourth Department stated that "[w]e have reviewed the defendant's other contentions on appeal, including the contentions made in his *pro se* brief, and we find them to be without merit." *Id.* Nor does the court order issued with regard to Jones's motion to vacate the conviction pursuant to N.Y.Crim. Proc. Law § 440 reveal whether the issues raised were considered under federal constitutional law.

review, in determining whether the constitutional error substantially influenced the jury's decision, a reviewing court should grant relief if it is in 'grave doubt as to the harmlessness' of a constitutional error." *Peck, supra,* at 454 (quoting *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

 In reviewing a state prisoner's petition pursuant to 28 U.S.C. § 2254, a district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution or any laws or treaties of the United States. *Coleman, supra,* at 729, 111 S.Ct. 2546. The AEDPA provides that a federal court may deny a state prisoner's habeas corpus petition on the merits of the claims for which the prisoner has exhausted available state remedies, even though the petition contains unexhausted claims. 28 U.S.C. § 2254(b)(2). Failure to timely exhaust state remedies will result in procedural default of the claims. *Spence v. Superintendent, Great Meadow Correctional Facility,* 219 F.3d 162, 169–70 (2d Cir.2000); *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993), *cert. denied,* 510 U.S. 1078, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994). In this case, all the grounds on which Jones seeks habeas relief have been exhausted, either on direct appeal or by the motion to vacate pursuant to N.Y.Crim. Proc. Law § 440. Accordingly, the court considers whether habeas relief is available on any of the grounds raised.

**1. *Resubmission to the Grand Jury***

The first four grounds for habeas relief raised in the Petition are essentially restatements of the same claim challenging the propriety of the District Attorney's decision to resubmit the case to the Grand Jury based on the April 30 and May 2, 1983 statements of Jackson and Waker recanting their earlier Grand Jury testimony in January 1981. Accordingly, the court considers the first four grounds as one ground.

 The main function of a grand jury is to determine whether probable cause exists to believe that a crime has been committed and, if so, to file charges against such persons as are reasonably believed to have committed it. *Branzburg v. Hayes,* 408 U.S. 665, 686–87, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The grand jury does not sit to determine the truth of the charges brought against a defendant but, rather, to determine whether there is probable cause to believe that the charges are true, so as to require the defendant to stand trial. *Bracy v. United States,* 435 U.S. 1301, 1302, 98 S.Ct. 1171, 55 L.Ed.2d 489 (1978), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). In *United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), the Supreme Court stated that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment." *Williams, supra,* at 54, 112 S.Ct. 1735 (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 261, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)). The *Williams* court further reiterated that "review of facially valid indictments on [grounds of quality or adequacy of the evidence] would run counter to the whole history of the grand jury institution, and neither justice nor the concept of a fair trial requires it." *Williams, supra,* at 50, 112 S.Ct. 1735 (quoting *Costello v. United States,* 350 U.S. 359, 364, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Simply put, there is no federal constitutional impediment to a prosecution premised upon arguably untrue grand jury testimony absent a showing of knowledge by the prosecutor and actual materiality; rather, requiring the prosecutor to present exculpatory evidence to the grand jury would impose an unnecessary burden on

the grand jury system. *Williams, supra,* at 50, 112 S.Ct. 1735. Accordingly, such false testimony is not sufficient to warrant habeas corpus relief where Jones was subsequently convicted by a petit jury. *Bracy, supra,* at 1302, 98 S.Ct. 1171.

In *Bracy, supra,* a witness admitted at trial that he had committed perjury before the grand jury which indicted the defendants in the case. The trial court denied a motion to dismiss the indictment and the defendants were convicted of federal narcotics charges. In denying an application for a stay of the judgment pending disposition for *certiorari* to the Supreme Court, Justice Rehnquist stated:

> The grand jury does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them true, so as to require him to stand his trial. Because of this limited function, we have held that an indictment is not invalidated by the grand jury's consideration of hearsay, (*see Costello, supra* ), or by the introduction of evidence obtained in violation of the Fourth Amendment, (*see United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of the factfinding process, its introduction before the grand jury poses no such threat. I have no reason to believe this court will not abide by the language of Mr. Justice Black in *Costello, supra,* at 363, 76 S.Ct. 406: 'An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. *The Fifth Amendment requires nothing more.'*

*Bracy, supra,* at 1302–03, 98 S.Ct. 1171 (emphasis added).

The Second Circuit has held in the context of denying a habeas corpus petition that any errors in a state grand jury proceeding involving sufficiency of grand jury evidence, use of misleading and prejudicial evidence, and instructions given to the grand jury, were cured beyond a reasonable doubt in a trial and conviction before a petit jury. *Lopez v. Riley,* 865 F.2d 30 (2d Cir.1989) ("if federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceedings are *a fortiori* foreclosed in a collateral attack brought in a federal court.").

In the instant case, Jones claims that the Grand Jury never would have indicted him but for the allegedly false April 30 and May 2, 1983 written statements of Jackson and Waker which served as the new evidence on which the motion to resubmit the case to the Grand Jury was predicated. As stated, in the written statements, both Jackson and Waker recanted their previous Grand Jury testimony that they observed Cleague brandishing a handgun and that Jones shot Cleague in self-defense. Jackson and Waker each admitted that such previous Grand Jury testimony was perjured.

Assuming, *arguendo,* that the April 30 and May 2, 1983 statements of Jackson and Waker were falsely made, Jones has produced no evidence that the prosecution was aware of the falsehoods. *See United States v. Romano,* 706 F.2d 370, 374 (2d Cir.1983) (holding possible error by prosecutor in misleading grand jury did not warrant dismissal of the indictment where petit jury returned guilty verdict). Jones also does not argue, nor has he presented any evidence that the Grand Jury was not legally constituted and unbiased grand jury. Nor is there any merit to Jones's

assertion that the prosecutor's use of alleged perjured statements in support of the motion to resubmit the case to the Grand Jury amounts to a constitutional due process violation.

■■■■ There is no federal constitutional right to be indicted by a grand jury with respect to a state prosecution. *United States v. Thompson,* 144 F.2d 604, 605–06 (2d Cir.), *cert. denied,* 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944). Once a state has created such a right, however, it cannot cause that right to be forfeited in an arbitrary or fundamentally unfair manner. *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). New York's constitution provides for prosecution of a felony offense only upon a grand jury indictment. McKinney's Const. Art. 1, § 6. New York, therefore, must conform that right to the requirements of the due process clause under the Fourteenth Amendment. *Saldana v. New York,* 665 F.Supp. 271 (S.D.N.Y.1987), *rev'd on other grounds,* 850 F.2d 117 (2d Cir.1988).

■■■■ As stated, Jones does not challenge the actual grand jury proceedings upon resubmission but, rather, challenge the court's ruling granting the prosecution's motion for leave to resubmit the case to the Grand Jury. "It is undisputed that in New York, the resubmission of a grand jury charge is a state procedural issue, rather than a jurisdictional issue." *Batista v. Walker,* 1995 WL 453299, * 2 (S.D.N.Y. July 31, 1995). As such, the proper vehicle to challenge the resubmission of a case to another grand jury is through direct appeal or a motion to dismiss. *Id.* (citing *Roberts v. Scully,* 875 F.Supp. 182, 193 (S.D.N.Y.1995); *People v. Rodriguez,* 192 A.D.2d 562, 596 N.Y.S.2d

727, 727 (App. Div.2d Dep't 1993); and *People v. Holdridge,* 128 A.D.2d 1000, 513 N.Y.S.2d 537, 538 (App. Div.3d Dep't 1987)). Thus, no federal due process violation accrues merely because a state permits grand jury resubmission.

Jones did not raise this claim on direct appeal. Jones, however, did challenge the resubmission, pursuant to N.Y.Crim. Proc. Law § 210.40, in a pretrial omnibus motion to dismiss dated December 1, 1983. The state court, with regard to the motion, inspected the minutes and proceedings of both the first Grand Jury and the second Grand Jury. February 24, 1984 Decision and Order of New York Supreme Court Justice Thomas F. McGowan.[9] In denying the omnibus motion in the Decision and Order of May 16, 1984, the court observed that inconsistent testimony was given by Jackson and Waker regarding Jones's self-defense assertion. *Id.* at 3–4.

Jones also presented the issue in an state habeas corpus proceeding. The petition was dismissed on June 1, 1993, by Acting State Supreme Court Justice Mark H. Dadd, on the basis that the issue was inappropriate for habeas relief as it could have been raised on direct appeal or pursuant to a N.Y.Crim. Proc. Law § 440 proceeding. Accordingly, Jones moved to vacate the judgment pursuant to N.Y.Crim. Pro. Law § 440.10. On April 24, 1997, the motion was denied on its merits.

The record demonstrates extensive review in state court of Jones's challenge to the resubmission of his case to the Grand Jury. Indeed, Jones received all the federal process to which he was due on the subject. There is, therefore, no basis for granting habeas relief based on the resubmission of the case to the Grand Jury.

---

**9.** A copy of this Decision and Order is contained in the state court records submitted by

Respondent.

## 2. *Prosecutorial Misconduct*

Jones argues he was denied his right to a fair and impartial trial as numerous instances of prosecutorial misconduct permeated the Grand Jury and trial proceedings. In particular, Jones asserts that throughout his testimony before the second Grand Jury, the prosecutor portrayed Jones in a derogatory light namely, as a married man who was engaging in sexual relations with other women. Petitioner's Memorandum on Direct Appeal at 23–34.[10] Jones maintains that such personal attacks continued at his trial, including references upon his cross-examination regarding his relationship with Jackson's minor daughter whom he was accused of raping and other questions of a sexual overtone including Jones's possession of certain tools and equipment used in gynecological observations. Petitioner's Memorandum on Direct Appeal at 34–41. Jones further assets that the prosecutor engaged in a "litany" of improper comments and remarks during summation, characterizing Jones's theory of defense as "unreasonable," "a fairy tale," "a con job" and "a lie." *Id.* (citing T. 1216–1231).

The test for an alleged denial of due process based upon prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). To deny a petitioner due process based on a prosecutorial statement, the statement has to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990). "In evaluating whether allegedly improper comments by the pros-

ecutor are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial." *United States v. LaMorte,* 950 F.2d 80, 83 (2d Cir.1991) (citing *United States v. Biasucci,* 786 F.2d 504, 514 (2d Cir.1986), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986)). In determining the degree of prejudice to a petitioner, the factors to consider are the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *La Morte, supra,* at 83; *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981).

In reviewing a prosecutor's alleged inflammatory statements, it is necessary to distinguish between prosecutorial misstatements as ordinary trial error and a prosecutor's comments constituting egregious conduct. *Floyd v. Meachum, supra,* at 353; *Sales v. Harris,* 675 F.2d 532, 541 (2d Cir.1982), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982). In addition, such challenged statements must be evaluated against the backdrop of the whole trial, including the amount of evidence against the defendant and the court's instructions to the jury, and requires, for a grant of a writ on this basis, that the references be excessive or inflammatory. *See Floyd v. Meachum, supra,* at 354–55; *United States v. Bivona,* 487 F.2d 443 (2d Cir.1973). No matter how improper the prosecutor's comments were, the only concern of the court in reviewing a claim of prosecutorial misconduct on a federal habeas petition is the fundamental

---

**10.** In support of his petition, Jones incorporates by reference the arguments asserted on direct appeal of his conviction to the Appellate Division, Fourth Department. Traverse at 3–5.

fairness of the trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

With regard to the prosecutor's cross-examination of Jones before the second Grand Jury, the Second Circuit has held that "a guilty verdict by a petit jury remedies any possible defects in the grand jury indictment," including prosecutorial misconduct before the grand jury. *United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir.), *cert. denied*, 519 U.S. 1045, 117 S.Ct. 619, 136 L.Ed.2d 543 (1996). Accordingly, even if statements made by the prosecutor in cross-examining Jones before the second Grand Jury were improper, that Jones was subsequently convicted by a petit jury following trial renders such defect insufficient to warrant habeas relief.

■ The record also fails to demonstrate prosecutorial misconduct based on questions the prosecutor put to Jones during cross-examination at trial. Rather, the record established that the prosecutor's cross-examination of Jones was designed to impeach Jones's credibility, which was within the prosecutor's right. *Perez v. Jones*, 935 F.2d 480, 483 (2d Cir.1991) (denying petition for habeas relief based on prosecutorial misconduct as prosecutor's cross-examination of sole defense witness designed to impeach witness's credibility in accordance with Fed.R.Evid. 608(b)).

Jones specifically objects to questions about (1) a certificate issued by the Ethical Hypnosis Training Center which Jones explains he received after completing a three day course via the mail and which qualifies him to hypnotize professionally (T. 989–91); (2) his relationship with Jackson's daughter whom Jones was accused of raping (T. 1029–31); (3) the recent murder of Jones's tenant, Tanya Young, inside the apartment she leased from Jones (T. 1073); (4) and whether Jones had ever used cer-

tain pieces of medical equipment used for gynecological examinations and found in Jones's garage. (T. 115–17). It is axiomatic that the prosecutor is permitted to cross-examine any defendant in a criminal trial who takes the witness stand on his own behalf in order to impeach the credibility of such defendant. Accordingly, Jones, by choosing to testify at trial on his own behalf, opened himself up to the questions posed to him by the prosecutor and Jones's subsequent resentment of such questions is irrelevant. Moreover, because these questions were unrelated to the second degree murder and criminal weapons possession charges, Jones's answers to them did not go to his guilt or innocence of the indicted offenses but, rather, only to his credibility. *Perez, supra* (observing that defense witness's invocation of the Fifth Amendment in refusing to answer certain questions unrelated to charges pending against the defendant and intended to impeach the witness's credibility could not be used to build the prosecution's case-in-chief against the defendant). Significantly, as Jones has never denied shooting Cleague but, rather, proceeded to trial on a self-defense theory, Jones's credibility, as to the true sequence of events at the bar prior to Cleague' shooting, was crucial to the jury's determination of the charges pending against Jones.

■ As to Jones's assertion that prosecutorial misconduct during summation warrants habeas relief, the record establishes that the prosecutor's summation called upon the jury to question Jones's credibility, characterizing Jones as, *inter alia*, a liar, a "con artist" and a "flimflam man." (T. 1216–17). Defense counsel's only objection during summation, however, was to the prosecutor's comment that when Jones testified about previously being employed as a pipefitter, Jones was really referring to his illegal siphoning of

gas from one property he owned to the house next door which he also owned. (T. 1218). The trial judge sustained the objection (T. 1218), and Jones has not challenged Cantwell's assistance of counsel as ineffective based on his failure to further object. Accordingly, only the pipefitter comment has been preserved for review.

■■■■ Improper statements during summation must cause "substantial prejudice" to the defendant before a conviction can be overturned. *Eltayib, supra*, at 172. Statements made by prosecutors in their summation, even if seemingly improper, do not necessarily exceed "the broad range of rhetorical comments allowed in closing arguments." *Harper v. Kelly*, 704 F.Supp. 375, 379 (S.D.N.Y.1989), *rev'd on other grounds*, 916 F.2d 54 (1990). *See also Donnelly, supra*, at 646–47, 94 S.Ct. 1868 (isolated passages of a prosecutor's argument, even if imperfect, do not suggest that a jury will be so profoundly affected so as to affect the fundamental fairness of a trial).

In this case, the prosecutor's comments during summation regarding Jones's credibility are properly considered rhetorical comments that are not so inflammatory as to affect the fundamental fairness of Jones's trial. Rather, the record as a whole establishes that in cross-examining Jones, the prosecutor attempted to demonstrate to the jury that Jones's claimed past occupations indicated that Jones was manipulative and dishonest, matters reasonably related to Jones's capacity for truthfulness. In particular, statements elicited from Jones on cross-examination include that he had previously worked as a pipefitter (T. 996), a hypnotist (T. 997) and a real estate manager (T. 997). Jones also testified he provided counseling to people and that some people referred to him as a doctor, although he himself did not. (T. 998). Jones admitted he was aware that

Jackson was undergoing psychiatric treatment for depression for which she took prescription medication and that he had signed papers for Jackson's psychiatric treatment as "Dr. Jones." (T. 1001–04, 1130). Jones testified that he held himself out as a teacher of a hypnosis course for a fee. (T. 1027–28). Accordingly, references to Jones during the prosecutor's summation as a "liar," "con artist" and "flimflam man" constitute no more than rhetorical comments in line with the theory of prosecution. Accordingly, the court finds such comments did not so inflame the jury as to affect the fundamental fairness of the trial.

Jones has thus failed to demonstrate prosecutorial misconduct based on the prosecutor's remarks before the Grand Jury, during the trial or summation. Jones's petition should, on this ground, be DISMISSED.

### 3. *Sufficiency of the Evidence*

Jones seeks habeas relief on the basis that the verdict was against the weight of the evidence. Specifically, Jones maintains that the "credible" evidence required the jury to find that Cleague pulled a gun on Jones and that Jones shot Cleague in self-defense. Petitioner's Memorandum on Direct Appeal at 42–45 (Respondent's Ex. B). Jones takes particular issue with numerous inconsistencies in the testimony given by the prosecution's witnesses, arguing that such inconsistencies should have been resolved in his favor. *Id.* at 43–45.

■■■■ "A habeas petitioner challenging the sufficiency of the evidence supporting his conviction bears a heavy burden." *Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir.), *cert. denied*, 515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995). The standard to be applied in a federal habeas corpus petition when the claim is made that the petitioner has been convicted in

state court on insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In considering the sufficiency of the evidence on a habeas petition attacking a conviction, the court is required to look to the relevant state law to determine the elements of the crime. *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999). Where facts presented at trial support conflicting inferences, a federal habeas court must presume that conflicts were resolved in favor of the prosecution. *Jackson, supra,* at 326, 99 S.Ct. 2781. The court is not required to decide whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but whether any rational trier of fact could have found guilt beyond a reasonable doubt based on the evidence presented. *See Jackson, supra,* at 319, 99 S.Ct. 2781. In making this assessment, a federal habeas court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe,* 846 F.2d 866, 869 (2d Cir.1988), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988). The jury is also permitted to "draw reasonable inferences from basic facts to ultimate facts." *Jackson, supra,* at 319, 99 S.Ct. 2781. The instant record demonstrates sufficient evidence supports Jones's conviction of intentional murder in the second degree.

Pursuant to New York law, a person is guilty of intentional murder in the second degree when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25[1]. Intent is established by proving what was in the defendant's mind at the time of the crime. *Mallette v. Scully,* 752 F.2d 26, 32 (2d Cir.1984). Intent need not be proven by the defendant's express statement but may be inferred, *Fratarcangelo v. Smith,* 792 F.2d 40, 43 (2d Cir. 1986), and "circumstantial evidence is as persuasive as direct evidence" with regard to establishing an intent to kill. *Mallette, supra.* Such circumstantial evidence may, under New York law, include a defendant's actions subsequent to the crime, such as falsehoods and flight. *Mallette, supra,* at 32 (citing cases).

Accordingly, in the instant case, by finding Jones guilty of intentionally murdering Cleague, the jury found, either by direct or circumstantial evidence, that Jones had formed the requisite intent to kill someone when he fired the shots that struck Cleague. The court, therefore, considers whether the record as a whole contains sufficient evidence to support such a finding. The record demonstrates that Gloria Jackson, Melida Gay Waker, Nora Coleman and Ossie Mae Shaw each identified Jones as the individual who shot Cleague at the Peyton Place Lounge on November 2, 1980, (T. 245 (Jackson), 355–57 (Waker), and Coleman (520–21)), a fact which Jones does not deny. Rather, Jones argues that the jury failed to give sufficient credit to his own testimony and failed to resolve inconsistencies within the record in his favor. There is, however, no requirement that a criminal jury resolve evidentiary inconsistencies in the defendant's favor. Rather, conviction of a criminal offense requires proof of the defendant's guilt beyond a reasonable doubt and the jury is not required to resolve evidentiary inconsistencies in favor of the defendant. *See United States v. Walsh,* 194 F.3d 37, 52 (2d Cir.1999) (denying motion to vacate judgment as against the weight of the

evidence based on inconsistent testimony as it is within jury's province to resolve evidentiary inconsistencies against defendant).

Significantly, no one testified at trial that Cleague physically threatened Jones or brandished any weapon, and defense counsel brought out on cross-examination that both Jackson and Waker admitted giving perjured testimony at the first Grand Jury proceeding, and recanted such testimony. Following the shooting, both Tate and Coleman, seated three or four feet from where Cleague's slain body lay, observed Jones go through Cleague's clothing, retrieve the starter pistol from a pocket inside Cleague's overcoat, and place the pistol on the floor next to the body. (T. 489, 519). Another witness, Christine Gary, testified that she only observed the pistol laying on the floor next to Cleague's body after Jones stood up and walked away. (T. 459–60). A reasonable jury could thus find Cleague did not pull a gun on Jones justifying a fatal retaliation.

Jackson and Waker consistently testified that after shooting Cleague, Jones returned to his place at the bar and directed both of them to say that Cleague pulled a gun on Jones. (T. 251, 299, 363–65). Such testimony negates Jones's assertion that there was no time for him to instruct Jackson and Waker to fabricate the self-defense story given that he and Waker were separately taken to the police station where they gave such statements less than an hour after the shooting, and Jackson was not taken into custody. (T. 249–50).

The above described testimony was sufficient for the jury to determine that Jones did not shoot Cleague in self defense. Nor does Jones contend that the evidence was not sufficient to establish the *mens rea* requirement of intent sufficient for the jury to find Jones guilty of intentional murder in the second degree beyond a reasonable doubt in violation of N.Y. Penal Law § 125.25[1]. Moreover, it is reasonable to conclude that firing multiple shots from a gun, which is a weapon designed to kill and maim humans, at another person standing less than ten feet away (*see* T. 248), is likely to result in the death of that person and a reasonably jury could find and infer from such facts an unjustified intent to kill. That there was no testimony at trial, other than Jones's own self-serving statements that Cleague displayed a weapon just prior to the shooting readily supports the jury's finding that Jones intended to kill Cleague outright, rather than in self defense.

Habeas relief should, on this ground, be DENIED.

### 4. *Sandoval Ruling*

Jones challenges Justice Doyle's ruling following the *Sandoval* hearing insofar as the prosecution was permitted to question Jones as to the rape investigation involving Jackson's minor daughter which was pending before a state Grand Jury at the time of Jones's trial. According to Jones, permitting the prosecution to impeach his credibility by inquiring about the pending rape charge portrayed him as "evil" and allowed him to be convicted based on the unrelated charge. Petitioner's Memorandum on Direct Appeal at 46–50.

State court rulings on evidentiary matters are matters of state law and "are not reviewable by a habeas court unless the errors alleged are so prejudicial as to constitute fundamental unfairness." *Rosario v. Kuhlman,* 839 F.2d 918, 924–25 (2d Cir.1988). *Sandoval* rulings are evidentiary rulings that must be reviewed by the habeas court in light of this standard. *See Jenkins v. Bara,* 663 F.Supp. 891, 899 (E.D.N.Y.1987) (refusing to review trial

court's *Sandoval* ruling which it characterized as evidentiary in nature and thus not redressable in a federal habeas corpus proceeding absent a showing that the particular errors were of constitutional magnitude).

In the instant case, assuming, *arguendo*, that the *Sandoval* determination is reviewable, it was not so inherently prejudicial as to pose an unacceptable threat to Jones's right to a fair trial. Rather, Jackson's testimony about the pending rape investigation was admissible to explain why Jackson had recanted her initial Grand Jury testimony. On the other hand, a jury considering such testimony could have interpreted the alleged rape as an incentive for Jackson to fabricate her recantation, which would tend to exculpate Jones. Accordingly, even if the *Sandoval* ruling was erroneous, it was not so prejudicial as to constitute "fundamental unfairness." *Rosario, supra,* at 924–25. The petition for habeas relief should, therefore, be denied as to this ground.

### 5. *Pro Se Examination of Witness*

Jones asserts that the trial court erroneously permitted him to examine, *pro se*, a prosecution witness, Jackson, without first inquiring into his understanding of proceeding without counsel. In particular, Jones characterizes such examination as "awkward and rambling," caused the jury to see him as "manipulative" and, therefore, was prejudicial to him. Petitioner's Memorandum on Direct Appeal at 50–52. According to Jones, a proper "searching inquiry by the court" as to his understanding of the risks of proceeding without counsel would have alerted Jones that "the jury could become preoccupied with his personality in such a way as to damage seriously his right to a fair trial." *Id.* at 52.

A criminal defendant's "right to self-representation is drawn from the very essence of the Sixth Amendment with the accused enjoying the right 'to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.'" *United States v. Purnett,* 910 F.2d 51, 54 (2d Cir.1990)(quoting U.S. Const. amend. VI). The essential element of the right to self-representation is the right to determine one's fate in the face of the risk of conviction. *Faretta v. California,* 422 U.S. 806, 816–17, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Thus, the Sixth Amendment right to counsel logically implies the right to self-representation as it is the defendant that bears the consequences of the trial. *Purnett, supra* (citing *Faretta, supra,* at 818–820, 95 S.Ct. 2525). However, federal due process requires that defendant's waiver of his constitutional right to counsel must be "knowingly and intelligently" made. *Faretta, supra,* at 835, 95 S.Ct. 2525.

In the instant case, the record reveals that Jones discussed his intention to examine Jackson, *pro se,* on two occasions. (T. 967–69, 1141–47). Both times, the court inquired as to why Jones, who was otherwise represented by Mr. Cantwell at trial, desired to conduct such examination. *Id.* Both times, Jones explained that his superior knowledge of the intimate details of the testimony he intended to elicit from Jackson rendered Jones more qualified than Mr. Cantwell to conduct the examination. (T. 968, 1142). Mr. Cantwell also advised the court that Jones was undertaking such task against his legal advice. (T. 967). The court allowed the *pro se* examination only as to new matters and the court advised the jury the examination was being conducted by Jones because Jones

believed his past familiarity with Jackson would facilitate the questioning. (T. 1147).

Jones then commenced questioning Jackson about his past relationship with her, including Jackson's earlier testimony at trial that Jones had physically abused her, that she feared him, and that Jackson and Jones had never been romantically involved. (T. 1148–51, 1156–57). Jones questioned Jackson as to whether a certain letter Jackson sent Jones after moving to a new apartment was written in 1975 or 1976. (T. 1152–55). Jones then requested permission to call his wife, Gail Jones to the stand, but the request was refused pending Jones's completion of his examination of Jackson. (T. 1158). At that time, the court posed some additional questions to Jackson and Cantwell took over for Jones. (T. 1158–60). Excerpts from the letter read into the record indicate that Jackson had feelings for Jones and was disappointed that Jones had decided to reconcile with his wife. (T. 1160–62). Additionally, even if Jackson's credibility had been more effectively impeached by Cantwell instead of Jones, the testimony of the witness whom Jones did not examine sustained the jury's conviction.

The court finds the decision to permit Jones to examine Jackson *pro se* resulted in no prejudice to him. Indeed, the record reveals that the testimony Jones elicited from Jackson, although not flattering to him, was merely repetitious of testimony Jackson already gave on direct examination by the prosecution. (*Compare* T. 197–331) (initial direct and cross examination) with T. 1148–60 (subsequent direct examination commenced by Jones). Accordingly, the habeas petition should be DENIED as to this aspect.

### CONCLUSION

Based on the foregoing, the motion for summary judgment (Docket No. 27) should be DENIED; the Petition (Docket No. 1), the Amended Petition (Docket No. 14) and the mandamus petition (Docket No. 22) should be DISMISSED, the motion for rescission of this court's briefing schedule (Docket No. 28) is DENIED; the motion to expedite (Docket No. 29) and the amended motion to expedite (Docket No. 30) are DISMISSED as moot. Further, as the court finds there is no substantial question presented for appellate review, a certificate of appealability should not issue. 28 U.S.C. § 2253(c)(2) (1996).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Petitioner and the Respondent.

SO ORDERED.

July 26, 2002.